## MIAMI HERALD PUBLISHING CO., DIVISION OF KNIGHT NEWSPAPERS, INC. *v.* TORNILLO

No. 73–797.   Argued April 17, 1974—Decided June 25, 1974

242

*Daniel P. S. Paul* argued the cause for appellant. With him on the briefs were *James W. Beasley, Jr.,* and *Richard M. Schmidt, Jr.*

*Jerome A. Barron* argued the cause for appellee. With him on the brief were *Tobias Simon* and *Elizabeth duFresne.**

---

*Briefs of *amici curiae* urging reversal were filed by *Joseph A. Califano, Jr.,* and *Richard M. Cooper* for Washington Post Co.; by *Robert C. Lobdell* and *Robert S. Warren* for Times Mirror Co.; by *James W. Rodgers* for New York News Inc.; by *Don H. Reuben* and *Lawrence Gunnels* for Chicago Tribune Co. et al.; by *Harold B. Wahl* for Florida Publishing Co.; by *William C. Ballard* for Times Publishing Co.; by *Spessard Lindsey Holland, Jr.,* for Gannett Florida Corp. et al.; by *Arthur B. Hanson, W. Frank Stickle, Jr.,* and *Ralph N. Albright, Jr.,* for the American Newspaper Publishers Assn.; by *William G. Mullen* for the National Newspaper Assn.; by *Leonard H. Marks* for the American Society of Newspaper Editors et al.; by *Lawrence E. Walsh* and *Guy Miller Struve* for the Reporters Committee for Freedom of the Press Legal Defense and Research Fund et al.; by *John B. Summers* for the National Association of Broadcasters; by *J. Laurent Scharff* for Radio Television News Directors Assn.; by *Floyd Abrams, Corydon B. Dunham,* and *Howard Monderer* for National Broadcasting Co., Inc.; by *Harry A. Inman* and *D. Robert Owen* for Dow Jones & Co., Inc., et al.; and by *Jonathan L. Alpert, Irma Robbins Feder,* and *Richard Yale Feder* for the American Civil Liberties Union of Florida.

Briefs of *amici curiae* urging affirmance were filed by *Albert H. Kramer* and *Thomas R. Asher* for the National Citizens Committee for Broadcasting, and by *Donald U. Sessions pro se.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The issue in this case is whether a state statute granting a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper violates the guarantees of a free press.

I

In the fall of 1972, appellee, Executive Director of the Classroom Teachers Association, apparently a teachers' collective-bargaining agent, was a candidate for the Florida House of Representatives. On September 20, 1972, and again on September 29, 1972, appellant printed editorials critical of appellee's candidacy.[1] In

---

[1] The text of the September 20, 1972, editorial is as follows:
    "The State's Laws And Pat Tornillo
"LOOK who's upholding the law!
"Pat Tornillo, boss of the Classroom Teachers Association and candidate for the State Legislature in the Oct. 3 runoff election, has denounced his opponent as lacking 'the knowledge to be a legislator, as evidenced by his failure to file a list of contributions to and expenditures of his campaign as required by law.'
"Czar Tornillo calls 'violation of this law inexcusable.'
"This is the same Pat Tornillo who led the CTA strike from February 19 to March 11, 1968, against the school children and taxpayers of Dade County. Call it whatever you will, it was an illegal act against the public interest and clearly prohibited by the statutes.
"We cannot say it would be illegal but certainly it would be inexcusable of the voters if they sent Pat Tornillo to Tallahassee to occupy the seat for District 103 in the House of Representatives."
    The text of the September 29, 1972, editorial is as follows:
"FROM the people who brought you this—the teacher strike of '68—come now instructions on how to vote for responsible government, i.e., against Crutcher Harrison and Ethel Beckham, for Pat Tornillo. The tracts and blurbs and bumper stickers pile up daily in teachers' school mailboxes amidst continuing pouts that the School Board should be delivering all this at your expense. The screeds

response to these editorials appellee demanded that appellant print verbatim his replies, defending the role of the Classroom Teachers Association and the organization's accomplishments for the citizens of Dade County. Appellant declined to print the appellee's replies, and appellee brought suit in Circuit Court, Dade County, seeking declaratory and injunctive relief and actual and punitive damages in excess of $5,000. The action was premised on Florida Statute § 104.38 (1973), a "right of reply" statute which provides that if a candidate for nomination or election is assailed regarding his personal character or official record by any newspaper, the candidate has the right to demand that the newspaper print, free of cost to the candidate, any reply the candidate may make to the newspaper's charges. The reply must appear in as conspicuous a place and in the same kind of type as the charges which prompted the reply, provided it does not take up more space than the charges. Failure to comply with the statute constitutes a first-degree misdemeanor.[2]

---

say the strike is not an issue. We say maybe it wouldn't be were it not a part of a continuation of disregard of any and all laws the CTA might find aggravating. Whether in defiance of zoning laws at CTA Towers, contracts and laws during the strike, or more recently state prohibitions against soliciting campaign funds amongst teachers, CTA says fie and try and sue us—what's good for CTA is good for CTA and that is natural law. Tornillo's law, maybe. For years now he has been kicking the public shin to call attention to his shakedown statesmanship. He and whichever acerbic prexy is in alleged office have always felt their private ventures so chock-full of public weal that we should leap at the chance to nab the tab, be it half the Glorious Leader's salary or the dues checkoff or anything else except perhaps mileage on the staff hydrofoil. Give him public office, says Pat, and he will no doubt live by the Golden Rule. Our translation reads that as more gold and more rule."

[2] "104.38 *Newspaper assailing candidate in an election; space for reply*—If any newspaper in its columns assails the personal charac-

Appellant sought a declaration that § 104.38 was unconstitutional. After an emergency hearing requested by appellee, the Circuit Court denied injunctive relief because, absent special circumstances, no injunction could properly issue against the commission of a crime, and held that § 104.38 was unconstitutional as an infringement on the freedom of the press under the First and Fourteenth Amendments to the Constitution. 38 Fla. Supp. 80 (1972). The Circuit Court concluded that dictating what a newspaper must print was no different from dictating what it must not print. The Circuit Judge viewed the statute's vagueness as serving "to restrict and stifle protected expression." *Id.*, at 83. Appellee's cause was dismissed with prejudice.

On direct appeal, the Florida Supreme Court reversed, holding that § 104.38 did not violate constitutional guarantees. 287 So. 2d 78 (1973).[3] It held that free speech was enhanced and not abridged by the Florida right-of-reply statute, which in that court's view, furthered the "broad societal interest in the free flow of information to the public." *Id.*, at 82. It also held that the statute is

---

ter of any candidate for nomination or for election in any election, or charges said candidate with malfeasance or misfeasance in office, or otherwise attacks his official record, or gives to another free space for such purpose, such newspaper shall upon request of such candidate immediately publish free of cost any reply he may make thereto in as conspicuous a place and in the same kind of type as the matter that calls for such reply, provided such reply does not take up more space than the matter replied to. Any person or firm failing to comply with the provisions of this section shall be guilty of a misdemeanor of the first degree, punishable as provided in § 775.082 or § 775.083."

[3] The Supreme Court did not disturb the Circuit Court's holding that injunctive relief was not proper in this case even if the statute were constitutional. According to the Supreme Court neither side took issue with that part of the Circuit Court's decision. 287 So. 2d, at 85.

not impermissibly vague; the statute informs "those who are subject to it as to what conduct on their part will render them liable to its penalties." *Id.*, at 85.[4] Civil remedies, including damages, were held to be available under this statute; the case was remanded to the trial court for further proceedings not inconsistent with the Florida Supreme Court's opinion.

We postponed consideration of the question of jurisdiction to the hearing of the case on the merits. 414 U. S. 1142 (1974).

## II

Although both parties contend that this Court has jurisdiction to review the judgment of the Florida Supreme Court, a suggestion was initially made that the judgment of the Florida Supreme Court might not be "final" under 28 U. S. C. § 1257.[5] In *North Dakota State Pharmacy Bd.* v. *Snyder's Stores,* 414 U. S. 156 (1973), we reviewed a judgment of the North Dakota Supreme Court, under which the case had been remanded so that further state proceedings could be conducted respecting Snyder's application for a permit to operate a drug store. We held that to be a final judgment for purposes of our jurisdiction. Under the principles of finality enunciated in *Snyder's Stores,* the judgment of

---

[4] The Supreme Court placed the following limiting construction on the statute:

"[W]e hold that the mandate of the statute refers to 'any reply' which is wholly responsive to the charge made in the editorial or other article in a newspaper being replied to and further that such reply will be neither libelous nor slanderous of the publication nor anyone else, nor vulgar nor profane." *Id.*, at 86.

[5] Appellee's Response to Appellant's Jurisdictional Statement and Motion to Affirm the Judgment Below or, in the Alternative, to Dismiss the Appeal 4–7.

the Florida Supreme Court in this case is ripe for review by this Court.[6]

## III

### A

The challenged statute creates a right to reply to press criticism of a candidate for nomination or election. The statute was enacted in 1913, and this is only the second recorded case decided under its provisions.[7]

Appellant contends the statute is void on its face because it purports to regulate the content of a newspaper in violation of the First Amendment. Alternatively it is urged that the statute is void for vagueness since no editor could know exactly what words would call the statute into operation. It is also contended that the statute fails to distinguish between critical comment which is and which is not defamatory.

### B

The appellee and supporting advocates of an enforceable right of access to the press vigorously argue that

---

[6] Both appellant and appellee claim that the uncertainty of the constitutional validity of § 104.38 restricts the present exercise of First Amendment rights. Brief for Appellant 41; Brief for Appellee 79. Appellant finds urgency for the present consideration of the constitutionality of the statute in the upcoming 1974 elections. Whichever way we were to decide on the merits, it would be intolerable to leave unanswered, under these circumstances, an important question of freedom of the press under the First Amendment; an uneasy and unsettled constitutional posture of § 104.38 could only further harm the operation of a free press. *Mills* v. *Alabama*, 384 U. S. 214, 221–222 (1966) (DOUGLAS, J., concurring). See also *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 418 n. (1971).

[7] In its first court test the statute was declared unconstitutional. *State* v. *News-Journal Corp.*, 36 Fla. Supp. 164 (Volusia County Judge's Court, 1972). In neither of the two suits, the instant action and the *News-Journal* action, has the Florida Attorney General defended the statute's constitutionality.

government has an obligation to ensure that a wide variety of views reach the public.[8]  The contentions of access proponents will be set out in some detail.[9]  It is urged that at the time the First Amendment to the Constitution [10] was ratified in 1791 as part of our Bill of Rights the press was broadly representative of the people it was serving.  While many of the newspapers were intensely partisan and narrow in their views, the press collectively presented a broad range of opinions to readers.  Entry into publishing was inexpensive; pamphlets and books provided meaningful alternatives to the organized press for the expression of unpopular ideas and often treated events and expressed views not covered by conventional newspapers.[11]  A true marketplace of ideas existed in which there was relatively easy access to the channels of communication.

Access advocates submit that although newspapers of the present are superficially similar to those of 1791 the press of today is in reality very different from that known in the early years of our national existence.  In the past half century a communications revolution has seen the introduction of radio and television into our lives, the promise of a global community through the

---

[8] See generally Barron, Access to the Press—A New First Amendment Right, 80 Harv. L. Rev. 1641 (1967).

[9] For a good overview of the position of access advocates see Lange, The Role of the Access Doctrine in the Regulation of the Mass Media: A Critical Review and Assessment, 52 N. C. L. Rev. 1, 8–9 (1973) (hereinafter Lange).

[10] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[11] See Commission on Freedom of the Press, A Free and Responsible Press 14 (1947) (hereinafter sometimes Commission).

use of communications satellites, and the specter of a "wired" nation by means of an expanding cable television network with two-way capabilities. The printed press, it is said, has not escaped the effects of this revolution. Newspapers have become big business and there are far fewer of them to serve a larger literate population.[12] Chains of newspapers, national newspapers, national wire and news services, and one-newspaper towns,[13] are the dominant features of a press that has become noncompetitive and enormously powerful and influential in its capacity to manipulate popular opinion and change the course of events. Major metropolitan newspapers have collaborated to establish news services national in scope.[14] Such national news organizations provide syndicated "interpretive reporting" as well as syndicated features and commentary, all of which can serve as part of the new school of "advocacy journalism."

The elimination of competing newspapers in most of our large cities, and the concentration of control of media that results from the only newspaper's being owned by the same interests which own a television station and a radio station, are important components of this trend toward

---

[12] Commission 15. Even in the last 20 years there has been a significant increase in the number of people likely to read newspapers. Bagdikian, Fat Newspapers and Slim Coverage, Columbia Journalism Review 15, 16 (Sept./Oct. 1973).

[13] "Nearly half of U. S. daily newspapers, representing some three-fifths of daily and Sunday circulation, are owned by newspaper groups and chains, including diversified business conglomerates. One-newspaper towns have become the rule, with effective competition operating in only 4 percent of our large cities." Background Paper by Alfred Balk in Twentieth Century Fund Task Force Report for a National News Council, A Free and Responsive Press 18 (1973).

[14] Report of the Task Force in Twentieth Century Fund Task Force Report for a National News Council, A Free and Responsive Press 4 (1973).

concentration of control of outlets to inform the public.

The result of these vast changes has been to place in a few hands the power to inform the American people and shape public opinion.[15] Much of the editorial opinion and commentary that is printed is that of syndicated columnists distributed nationwide and, as a result, we are told, on national and world issues there tends to be a homogeneity of editorial opinion, commentary, and interpretive analysis. The abuses of bias and manipulative reportage are, likewise, said to be the result of the vast accumulations of unreviewable power in the modern media empires. In effect, it is claimed, the public has lost any ability to respond or to contribute in a meaningful way to the debate on issues. The monopoly of the means of communication allows for little or no critical analysis of the media except in professional journals of very limited readership.

> "This concentration of nationwide news organizations—like other large institutions—has grown increasingly remote from and unresponsive to the popular constituencies on which they depend and which depend on them." Report of the Task Force in Twentieth Century Fund Task Force Report for a National News Council, A Free and Responsive Press 4 (1973).

Appellee cites the report of the Commission on Freedom of the Press, chaired by Robert M. Hutchins, in which it was stated, as long ago as 1947, that "[t]he right of free

---

[15] "Local monopoly in printed news raises serious questions of diversity of information and opinion. What a local newspaper does not print about local affairs does not see general print at all. And, having the power to take initiative in reporting and enunciation of opinions, it has extraordinary power to set the atmosphere and determine the terms of local consideration of public issues." B. Bagdikian, The Information Machines 127 (1971).

public expression has . . . lost its earlier reality." Commission on Freedom of the Press, A Free and Responsible Press 15 (1947).

The obvious solution, which was available to dissidents at an earlier time when entry into publishing was relatively inexpensive, today would be to have additional newspapers. But the same economic factors which have caused the disappearance of vast numbers of metropolitan newspapers,[16] have made entry into the marketplace of ideas served by the print media almost impossible. It is urged that the claim of newspapers to be "surrogates for the public" carries with it a concomitant fiduciary obligation to account for that stewardship.[17] From this premise it is reasoned that the only effective way to insure fairness and accuracy and to provide for some accountability is for government to take affirmative action. The First Amendment interest of the public in being informed is said to be in peril because the "marketplace of ideas" is today a monopoly controlled by the owners of the market.

Proponents of enforced access to the press take comfort from language in several of this Court's decisions which suggests that the First Amendment acts as a sword as well as a shield, that it imposes obligations on the owners of the press in addition to protecting the press from government regulation. In *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945), the Court, in

---

[16] The newspapers have persuaded Congress to grant them immunity from the antitrust laws in the case of "failing" newspapers for joint operations. 84 Stat. 466, 15 U. S. C. § 1801 *et seq.*

[17] "Freedom of the press is a right belonging, like all rights in a democracy, to all the people. As a practical matter, however, it can be exercised only by those who have effective access to the press. Where financial, economic, and technological conditions limit such access to a small minority, the exercise of that right by that minority takes on fiduciary or quasi-fiduciary characteristics." A. MacLeish in W. Hocking, Freedom of the Press 99 n. 4 (1947) (italics omitted).

rejecting the argument that the press is immune from the antitrust laws by virtue of the First Amendment, stated:

> "The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests." (Footnote omitted.)

In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), the Court spoke of "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." It is argued that the "uninhibited, robust" debate is not "wide-open" but open only to a monopoly in control of the press. Appellee cites the plurality opinion in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 47, and n. 15 (1971), which he suggests seemed to invite experimentation by the States in right-to-access regulation of the press.[18]

---

[18] "If the States fear that private citizens will not be able to respond adequately to publicity involving them, the solution lies in the

Access advocates note that Mr. Justice Douglas a decade ago expressed his deep concern regarding the effects of newspaper monopolies:

> "Where one paper has a monopoly in an area, it seldom presents two sides of an issue. It too often hammers away on one ideological or political line using its monopoly position not to educate people, not to promote debate, but to inculcate in its readers one philosophy, one attitude—and to make money."

> "The newspapers that give a variety of views and news that is not slanted or contrived are few indeed. And the problem promises to get worse . . . ." The Great Rights 124–125, 127 (E. Cahn ed. 1963).

They also claim the qualified support of Professor Thomas I. Emerson, who has written that "[a] limited right of access to the press can be safely enforced,"

---

direction of ensuring their ability to respond, rather than in stifling public discussion of matters of public concern.[*]

"[*]Some states have adopted retraction statutes or right-of-reply statutes . . . .

"One writer, in arguing that the First Amendment itself should be read to guarantee a right of access to the media not limited to a right to respond to defamatory falsehoods, has suggested several ways the law might encourage public discussion. Barron, Access to the Press—A New First Amendment Right, 80 Harv. L. Rev. 1641, 1666–1678 (1967). It is important to recognize that the private individual often desires press exposure either for himself, his ideas, or his causes. Constitutional adjudication must take into account the individual's interest in access to the press as well as the individual's interest in preserving his reputation, even though libel actions by their nature encourage a narrow view of the individual's interest since they focus only on situations where the individual has been harmed by undesired press attention. A constitutional rule that deters the press from covering the ideas or activities of the private individual thus conceives the individual's interest too narrowly."

although he believes that "[g]overnment measures to encourage a multiplicity of outlets, rather than compelling a few outlets to represent everybody, seems a preferable course of action." T. Emerson, The System of Freedom of Expression 671 (1970).

## IV

However much validity may be found in these arguments, at each point the implementation of a remedy such as an enforceable right of access necessarily calls for some mechanism, either governmental or consensual.[19] If it is governmental coercion, this at once brings about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years.[20]

The Court foresaw the problems relating to government-enforced access as early as its decision in *Associated Press* v. *United States, supra.* There it carefully contrasted the private "compulsion to print" called for by the Association's bylaws with the provisions of the District Court decree against appellants which "does not compel AP or its members to permit publication of anything which their 'reason' tells them should not be published." 326 U. S., at 20 n. 18. In *Branzburg* v. *Hayes,* 408 U. S. 665, 681 (1972), we emphasized that the cases then

---

[19] The National News Council, an independent and voluntary body concerned with press fairness, was created in 1973 to provide a means for neutral examination of claims of press inaccuracy. The Council was created following the publication of the Twentieth Century Fund Task Force Report for a National News Council, A Free and Responsive Press. The background paper attached to the Report dealt in some detail with the British Press Council, seen by the author of the paper as having the most interest to the United States of the European press councils.

[20] Because we hold that § 104.38 violates the First Amendment's guarantee of a free press we have no occasion to consider appellant's further argument that the statute is unconstitutionally vague.

before us "involve no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold." In *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 117 (1973), the plurality opinion as to Part III noted:

> "The power of a privately owned newspaper to advance its own political, social, and economic views is bounded by only two factors: first, the acceptance of a sufficient number of readers—and hence advertisers—to assure financial success; and, second, the journalistic integrity of its editors and publishers."

An attitude strongly adverse to any attempt to extend a right of access to newspapers was echoed by other Members of this Court in their separate opinions in that case. *Id.,* at 145 (STEWART, J., concurring); *id.,* at 182 n. 12 (BRENNAN, J., joined by MARSHALL, J., dissenting). Recently, while approving a bar against employment advertising specifying "male" or "female" preference, the Court's opinion in *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 391 (1973), took pains to limit its holding within narrow bounds:

> "Nor, *a fortiori,* does our decision authorize any restriction whatever, whether of content or layout, on stories or commentary originated by Pittsburgh Press, its columnists, or its contributors. On the contrary, we reaffirm unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial."

Dissenting in *Pittsburgh Press,* MR. JUSTICE STEWART, joined by MR. JUSTICE DOUGLAS, expressed the view that no "government agency—local, state, or federal—can tell

a newspaper in advance what it can print and what it cannot." *Id.,* at 400. See *Associates & Aldrich Co.* v. *Times Mirror Co.,* 440 F. 2d 133, 135 (CA9 1971).

We see that beginning with *Associated Press, supra,* the Court has expressed sensitivity as to whether a restriction or requirement constituted the compulsion exerted by government on a newspaper to print that which it would not otherwise print. The clear implication has been that any such a compulsion to publish that which " 'reason' tells them should not be published" is unconstitutional. A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated.

Appellee's argument that the Florida statute does not amount to a restriction of appellant's right to speak because "the statute in question here has not prevented the *Miami Herald* from saying anything it wished" [21] begs the core question. Compelling editors or publishers to publish that which " 'reason' tells them should not be published" is what is at issue in this case. The Florida statute operates as a command in the same sense as a statute or regulation forbidding appellant to publish specified matter. Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244–245 (1936). The Florida statute exacts a penalty on the basis of the content of a newspaper. The first phase of the penalty resulting from the compelled printing of a reply is exacted in terms of the cost in printing and composing time and materials and in taking up space that could be devoted to other material the newspaper may have preferred to print. It is correct, as appellee contends, that a newspaper is not subject to the

[21] Brief for Appellee 5.

finite technological limitations of time that confront a broadcaster but it is not correct to say that, as an economic reality, a newspaper can proceed to infinite expansion of its column space to accommodate the replies that a government agency determines or a statute commands the readers should have available.[22]

Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy. Therefore, under the operation of the Florida statute, political and electoral coverage would be blunted or reduced.[23] Government-enforced right of access inescapably "dampens the vigor and limits the variety of public debate," *New York Times Co.* v. *Sullivan,* 376 U. S., at 279. The Court, in *Mills* v. *Alabama,* 384 U. S. 214, 218 (1966), stated:

> "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates . . . ."

---

[22] "However, since the amount of space a newspaper can devote to 'live news' is finite,[*] if a newspaper is forced to publish a particular item, it must as a practical matter, omit something else.

"[*]The number of column inches available for news is predetermined by a number of financial and physical factors, including circulation, the amount of advertising, and, increasingly, the availability of newsprint. . . ." Note, 48 Tulane L. Rev. 433, 438 (1974) (one footnote omitted).

Another factor operating against the "solution" of adding more pages to accommodate the access matter is that "increasingly subscribers complain of bulky, unwieldy papers." Bagdikian, Fat Newspapers and Slim Coverage, Columbia Journalism Review 19 (Sept./Oct. 1973).

[23] See the description of the likely effect of the Florida statute on publishers, in Lange 70–71.

Even if a newspaper would face no additional costs to comply with a compulsory access law and would not be forced to forgo publication of news or opinion by the inclusion of a reply, the Florida statute fails to clear the barriers of the First Amendment because of its intrusion into the function of editors.  A newspaper is more than a passive receptacle or conduit for news, comment, and advertising.[24]  The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.  Accordingly, the judgment of the Supreme Court of Florida is reversed.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE REHNQUIST joins, concurring.

I join the Court's opinion which, as I understand it, addresses only "right of reply" statutes and implies no view upon the constitutionality of "retraction" statutes affording plaintiffs able to prove defamatory falsehoods a statutory action to require publication of a retraction.

---

[24] "[L]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper. · A journal does not merely print observed facts the way a cow is photographed through a plate-glass window.  As soon as the facts are set in their context, you have interpretation and you have selection, and editorial selection opens the way to editorial suppression.  Then how can the state force abstention from discrimination in the news without dictating selection?" 2 Z. Chafee, Government and Mass Communications 633 (1947).

See generally Note, Vindication of the Reputation of a Public Official, 80 Harv. L. Rev. 1730, 1739–1747 (1967).

MR. JUSTICE WHITE, concurring.

The Court today holds that the First Amendment bars a State from requiring a newspaper to print the reply of a candidate for public office whose personal character has been criticized by that newspaper's editorials. According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned. *New York Times Co.* v. *United States*, 403 U. S. 713 (1971). A newspaper or magazine is not a public utility subject to "reasonable" governmental regulation in matters affecting the exercise of journalistic judgment as to what shall be printed. Cf. *Mills* v. *Alabama*, 384 U. S. 214, 220 (1966). We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficent-sounding the purposes of controlling the press might be, we prefer "the power of reason as applied through public discussion" [1] and remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press.

> "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of

---

[1] *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring).

government, the manner in which government is operated or should be operated, and all such matters relating to political processes. The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs. Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve. Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills* v. *Alabama, supra,* at 218–219.

Of course, the press is not always accurate, or even responsible, and may not present full and fair debate on important public issues. But the balance struck by the First Amendment with respect to the press is that society must take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed. The press would be unlicensed because, in Jefferson's words, "[w]here the press is free, and every man able to read, all is safe."[2] Any other accommodation—any other system that would supplant private control of the press with the heavy hand of government intrusion—would make the government the censor of what the people may read and know.

To justify this statute, Florida advances a concededly important interest of ensuring free and fair elections by means of an electorate informed about the issues. But

---

[2] Letter to Col. Charles Yancey in 14 The Writings of Thomas Jefferson 384 (Lipscomb ed. 1904).

prior compulsion by government in matters going to the very nerve center of a newspaper—the decision as to what copy will or will not be included in any given edition—collides with the First Amendment. Woven into the fabric of the First Amendment is the unexceptionable, but nonetheless timeless, sentiment that "liberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." 2 Z. Chafee, Government and Mass Communications 633 (1947).

The constitutionally obnoxious feature of § 104.38 is not that the Florida Legislature may also have placed a high premium on the protection of individual reputational interests; for government certainly has "a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt* v. *Baer,* 383 U. S. 75, 86 (1966). Quite the contrary, this law runs afoul of the elementary First Amendment proposition that government may not force a newspaper to print copy which, in its journalistic discretion, it chooses to leave on the newsroom floor. Whatever power may reside in government to influence the publishing of certain narrowly circumscribed categories of material, see, *e. g.,* *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376 (1973); *New York Times Co.* v. *United States,* 403 U. S., at 730 (WHITE, J., concurring), we have never thought that the First Amendment permitted public officials to dictate to the press the contents of its news columns or the slant of its editorials.

But though a newspaper may publish without government censorship, it has never been entirely free from liability for what it chooses to print. See *ibid.* Among other things, the press has not been wholly at liberty to publish falsehoods damaging to individual reputation. At least until today, we have cherished the average citizen's

reputation interest enough to afford him a fair chance to vindicate himself in an action for libel characteristically provided by state law. He has been unable to force the press to tell his side of the story or to print a retraction, but he has had at least the opportunity to win a judgment if he has been able to prove the falsity of the damaging publication, as well as a fair chance to recover reasonable damages for his injury.

Reaffirming the rule that the press cannot be forced to print an answer to a personal attack made by it, however, throws into stark relief the consequences of the new balance forged by the Court in the companion case also announced today. *Gertz* v. *Robert Welch, Inc., post,* p. 323, goes far toward eviscerating the effectiveness of the ordinary libel action, which has long been the only potent response available to the private citizen libeled by the press. Under *Gertz,* the burden of proving liability is immeasurably increased, proving damages is made exceedingly more difficult, and vindicating reputation by merely proving falsehood and winning a judgment to that effect are wholly foreclosed. Needlessly, in my view, the Court trivializes and denigrates the interest in reputation by removing virtually all the protection the law has always afforded.

Of course, these two decisions do not mean that because government may not dictate what the press is to print, neither can it afford a remedy for libel in any form. *Gertz* itself leaves a putative remedy for libel intact, albeit in severely emaciated form; and the press certainly remains liable for knowing or reckless falsehoods under *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and its progeny, however improper an injunction against publication might be.

One need not think less of the First Amendment to sustain reasonable methods for allowing the average citi-

zen to redeem a falsely tarnished reputation. Nor does one have to doubt the genuine decency, integrity, and good sense of the vast majority of professional journalists to support the right of any individual to have his day in court when he has been falsely maligned in the public press. The press is the servant, not the master, of the citizenry, and its freedom does not carry with it an unrestricted hunting license to prey on the ordinary citizen.

> "In plain English, freedom carries with it responsibility even for the press; freedom of the press is not a freedom from responsibility for its exercise." "Without . . . a lively sense of responsibility a free press may readily become a powerful instrument of injustice." *Pennekamp* v. *Florida,* 328 U. S. 331, 356, 365 (1946) (Frankfurter, J., concurring) (footnote omitted).

To me it is a near absurdity to so deprecate individual dignity, as the Court does in *Gertz,* and to leave the people at the complete mercy of the press, at least in this stage of our history when the press, as the majority in this case so well documents, is steadily becoming more powerful and much less likely to be deterred by threats of libel suits.