NEWS AND SUN–SENTINEL
COMPANY, et al., Plaintiffs,

v.

BOARD OF COUNTY
COMMISSIONERS,
Defendant.

No. 86–7015–CIV.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

June 30, 1987.

Wilton L. Strickland, Fort Lauderdale,
Fla., for plaintiffs.

Gen. Counsel for Broward County, Fort
Lauderdale, Fla., for defendant.

MEMORANDUM OPINION

ROETTGER, District Judge.

Plaintiffs have challenged Broward
County Ordinance No. 86–36 ("Ordinance
86–36" or "Ordinance") as being facially
violative of the First and Fourteenth
Amendments. Ordinance 86–36 [1] makes it

1. Ordinance 86–36 provides:
No person, firm, corporation, or other legal entity shall knowingly publish an advertisement in any publication that is primarily circulated, displayed, distributed, or marketed within Broward County, which advertisement identifies a contractor offering services regulated by Chapter 489, Florida Statutes, or Chapter 9, Broward County Code of Ordinances, as they may be amended from time to time, unless the advertisement includes the certification number issued by the State of Florida or by Broward County to that contractor or unless the publisher has obtained an

a criminal misdemeanor to publish, in any publication distributed primarily in Broward County (Fort Lauderdale and environs), an advertisement relating to contracting services which are regulated by the County or the State of Florida, unless the advertisement includes the contractor's State or County certificate of competency number, or the publisher obtains an affidavit from the contractor stating that a certification number is not required.

Ordinance 86–36 supplements provisions of State and County law which prohibit uncertified contractors from advertising or otherwise holding themselves out as contractors, F.S. § 489.127(1)(a); Broward County Code § 9–23(a), and which require that certified contractors include their certification numbers when advertising their services, F.S. § 489.119(5)(b); Broward County Code § 9–23(b).[2] These underlying provisions are part of extensive, concurrent statutory schemes providing for the examination, certification, and regulation of contractors by the State of Florida and Broward County, which are intended to protect the public from dishonest and incompetent contractors. F.S. §§ 489.101 and 489.501; Broward County Code § 9–2. See general-

ly Chapter 489, Florida Statutes: Chapter 9, Broward County Code.[3]

## THE CLASSIFIEDS AND COMPLYING WITH THE ORDINANCE [4]

Plaintiff NEWS AND SUN–SENTINEL COMPANY ("NSS") publishes two daily newspapers, *The Fort Lauderdale News* and *Sun–Sentinel*, both of which are sold or distributed primarily in Broward County. The daily classified section of these newspapers include the "Gold Coast Service Directory," which lists a broad range of services offered for hire, including contracting services. Plaintiff NSS also publishes a "Yellow Page Directory," similar to the "Gold Coast Service Directory," in its "TV Book," a Sunday paper insert.

The classified ads, including those listed in the service directories, are placed almost exclusively by telephone. Plaintiff NSS employs forty sales representatives who take the incoming calls off of a rotator. On peak days, the Classified Department will handle up to two thousand calls. The goal is to keep no advertiser on hold for more than thirty seconds.

The average call lasts between 1½ and 2 minutes. In that time the sales representative gathers the pertinent ad information,

affidavit from the advertiser stating that a certification number is not required. No advertiser shall knowingly provide to a publisher a false certification number or a false affidavit stating that a certification number is not required. An advertisement shall be defined to include any announcement, listing, display, entry, or other written statement of whatever nature or kind, and specifically to include a name and address or telephone number placed under a heading, when the heading describes or encompasses services regulated by Chapter 489, Florida Statutes, or Chapter 9, Broward County Code of Ordinances. Any person who knowingly violates this Subsection shall be prosecuted in the name of the State of Florida in a court having jurisdiction of misdemeanors by the prosecuting attorney thereof and upon conviction shall be punished by a fine not to exceed five hundred dollars ($500.00) or by imprisonment in the county jail not to exceed sixty (60) days or by both such fine and imprisonment or as provided by law.
The Ordinance was added as § 21–91 of the Broward County Code, but redesignated as § 21–14.

2. This purpose is evident from the language of Ordinance 86–36 and the structure of the legislative scheme, as well as from the legislative findings and statement of purpose made regarding the Ordinance.

3. County law also generally prohibits false, deceptive, and misleading advertising in relation to the sale (or purchase) of any type of service. See Code §§ 20–164 and 21–4. These provisions also apply, for example, to the sale of goods and property. Members of the media are specifically exempted from the operation of these sections, however, when advertisements are published in good faith and without knowledge of the false, deceptive, or misleading character of the ad. See §§ 20–164(5) and 21–4(b).

4. A hearing on Plaintiffs' motion for preliminary injunction and two subsequent evidentiary hearings have been held. The court has also heard extensive oral argument by the parties. The temporary restraining order entered to maintain the status quo has been extended with Defendant's consent. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2953, at 517–18 (1973).

such as name or title, phone number, and business hours. If need be, the sales representative will make copy suggestions, usually in the form of abbreviations aimed at economizing the ad.

After gathering the needed information and arranging for the billing, the sales representative will prepare the format of the ad. If a service ad is involved, the sales representative must determine which of a possible 150 classifications or "headers" the ad falls under within the service directory. The ad will be listed first by classified header, then by size and alphabetical order. The sales representative then moves on to the next call.

Plaintiff NSS publishes approximately four hundred service advertisements each day. Of these ads, Plaintiff NSS' Classified Advertising Manager estimates that 50% will be affected by Ordinance 86–36. Additional information must be gathered by the sales representative in relation to the affected ads in order to comply with the Ordinance. Unless the contractor volunteers a certification number or indicates that an affidavit is required, the sales representative will have to inquire as to the contractor's licensing status. If the contractor states that a certification number is not required (whether on his own initiative or in response to the sales representative's questioning), the sales representative will have to obtain an affidavit, or verify that the contractor has an affidavit on file,[5] applicable to the type of contracting service being advertised.[6]

Of course, unless the contractor indicates that an affidavit or certification number is required, the sales representative will have to determine whether the services being advertised fall within the Ordinance's ambit. Such a determination will require knowledge of the extensive State and County regulations and the interpretation of those regulations, including the various possible exceptions.[7]

Complying with Ordinance 86–36 will, then, increase the length of each call relating to contracting services, thus reducing the number of calls handled by each sales representative. Staff time will also be expended training and instructing the sales representatives, presumably including periodic updates, concerning the Ordinance's application. Additional staff time will also be expended researching the law, drafting guidelines, and monitoring the sales representatives to ensure proper compliance with the Ordinance.

In concrete terms, complying with Ordinance 86–36 will require an additional twenty man-hours per week in order to properly question, research, and process the contracting advertisements. The estimated financial impact of these additional man-hours is $165 per week, or, $8,580 per year.

## COUNTY ENFORCEMENT

County enforcement of Ordinance 86–36 and the underlying County ordinances has been entrusted to the Consumer Affairs Division.[8] The Division is responsible for

---

**5.** The Ordinance does not indicate whether an affidavit must be obtained from the contractor each time he places an advertisement or whether publishers may maintain a central file of affidavits. Additional time will be expended by the sales representative, however, under either set of procedures.

**6.** Under County law, for example, electrical contractors are divided into three classifications—master, journeyman, and specialty electricians. See Code §§ 9–62 through 9–64. The specialty electricians are further divided into four categories. See § 9–65. Section 9–65 also provides for the creation of additional specialty categories.

**7.** Section 9–26 of the County Code, for example, provides for the exemption of various individu-

als from the County's certification requirements. Furthermore, neither Chapter 9 of the County Code nor Chapter 489 of the Florida Statutes applies to all contracting services. Testimony indicated, for example, that certification is required for acoustical ceiling work but not for domed ceiling work. Such distinctions are apparently not uncommon under either the County or State regulations.

**8.** No evidence was presented concerning the enforcement role played by the six examining and regulatory boards created by County Code § 9–41, which are empowered to enforce the provisions of Chapter 9, see § 9–46. These boards can revoke and suspend certificates of competency, see §§ 9–14, 9–28, and 9–45, as well as refer cases to the County's general coun-

the enforcement and implementation of the County's Consumer Protection Code, Broward County Code §§ 20–159 through 20–176.11,[9] and all other consumer protection legislation. See § 20–166.

The Division's enforcement of the underlying ordinances has proceeded along two lines. Consumer complaints are investigated as they are filed under Code § 20–170. Contractor advertisements are reviewed upon publication for the inclusion of certificate of competency numbers. If a valid number is not included, then the contractor's licensing status is investigated. The investigator must, of course, first determine whether the services being advertised require the inclusion of a certification number.

If the Division determines that a violation has occurred, it is empowered to refer the matter to the State Attorney's Office for prosecution, § 20–172, or to issue a cease and desist order, § 20–173. If such an order is issued, then the matter is forwarded to the Consumer Protection Board for a final hearing.

From August 1985 through January 1987, the Division undertook 1,692 investigations. As a result of these investigations, the Board issued 222 final cease and desist orders to uncertified contractors.

In response to the passage of Ordinance 86–36, the Consumer Affairs Division has hired a special projects coordinator to assist publishers in complying with the Ordinance.[10] Other than the coordinator's hiring, however, the County does not anticipate any change in its staffing levels or enforcement methods. The Consumer Affairs Division must now, of course, monitor publishers' compliance with Ordinance 86–36, in addition to contractors' compliance with the underlying ordinances, and refer

appropriate cases to the State Attorney's Office for prosecution.

### FREEDOM OF THE PRESS

■ Plaintiffs have relied principally on *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) and *Memphis Publishing Co. v. Leech,* 539 F.Supp. 405 (W.D.Tenn.1982), in arguing that the Ordinance improperly appropriates the media to enforce public policy and that the Ordinance impermissibly interferes with editorial judgment by dictating the content of material required for publication. To counter these arguments Defendant has relied on *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973).

In *Pittsburgh Press,* a newspaper publisher challenged an ordinance which had been construed as prohibiting newspapers from carrying "help-wanted" advertisements in sex-designated columns, except where the employer or job category was exempted from the anti-discrimination provisions of the ordinance. The terms of the ordinance forbade any "person" from aiding in the commission of any act declared to be an unlawful employment practice by the ordinance. Related sections of the ordinance declared sexual discrimination in hiring to be an unlawful employment practice and prohibited an employer from publishing, or causing to be published, an employment advertisement indicating any discriminatory sexual preference.

Justice Powell, writing for a 5–4 majority, concluded that the ordinance did not impermissibly regulate the press. He reasoned that the ordinance was not passed with any intent of muzzling or curbing the

---

sel for the initiation of civil enforcement actions, see §§ 9–28 and 9–46.

**9.** The media is generally exempted from the operation of the Consumer Protection Code. See § 20–176.8(2). This may explain why Ordinance 86–36 is codified as part of Chapter 21, Miscellaneous Offenses and Provisions, rather than as part of the Consumer Protection Code.

**10.** The coordinator's $21,000 salary has been added to the costs associated with enforcing the

underlying County ordinances. Although no evidence was presented indicating the amount spent by the County in prior years to enforce the underlying ordinances, or the current level of appropriation, at the public hearing on Ordinance 86–36 Commissioner Thompson suggested that full enforcement of the underlying ordinances would cost approximately $200,000 per year.

press and that there was no evidence suggesting that the ordinance threatened the plaintiff's financial viability "or impaire[d] in any significant way its ability to publish and distribute its newspaper." *Id.* at 383, 93 S.Ct. at 2558. In short, the case was not one in which "the challenged law arguably disables the press by undermining its institutional viability." *Id.* at 382, 93 S.Ct. at 2557.

Justice Powell recognized that the ordinance (as construed) did affect the make-up of the help-wanted section of the newspaper in a limited way. *Id.* at 383–86, 93 S.Ct. at 2557–59. The publisher would be required to abandon its policy of providing sex-designated columns and allowing employers to select the columns in which their help-wanted ads would be placed, and would be forbidden from substituting a policy under which it would make an independent decision regarding the placement of advertisements in sex-designated columns. *Id.* at 383–84, 93 S.Ct. at 2557–58. The publisher would not, however, be prohibited in any way from publishing advertisements which commented on the challenged ordinance or the propriety of sexual preferences in employment. Nor would the publisher be subjected to any restrictions concerning the content or layout of stories or commentary originated by the paper, its columnists, or its contributors. *Id.* at 391, 93 S.Ct. at 2561. The limited intrusion on editorial judgment thus did not infringe upon the freedom of the press. *Id.*[11]

The following year in *Miami Herald* the Court was presented with a challenge to a right-to-reply statute. The statute granted political candidates a right to equal space to reply to criticism and attacks on their record by newspapers. The Court, per Chief Justice Burger, concluded that the statute exacted a "penalty" on the basis of newspaper content. The penalty included the cost incurred for the time and materials

used in printing and composing the reply, as well as the print or column space needed to accommodate replies. 418 U.S. at 256–57, 94 S.Ct. at 2838–39. Such penalties might lead newspapers to steer clear of publishing news or commentary arguably within the reach of the statute, thereby blunting or reducing political and electoral coverage. The effect would be to dampen the vigor and variety of public debate and undermine one of the major purposes of the First Amendment—the free discussion of governmental affairs. *Id.* at 257, 94 S.Ct. at 2839.

The Court also concluded, in sweeping language, that even if a newspaper would not incur additional costs in complying with such a statute and would not be forced to forego the publication of news or opinion by the inclusion of a reply, the statute would still violate the First Amendment because of its intrusion into the function of editors. *Id.* at 258, 94 S.Ct. at 2839. Choices as to the size and content of a newspaper, including the treatment of public issues and officials, constituted the exercise of editorial control and judgment, and it had yet to be demonstrated that governmental regulation of "this crucial process" could be exercised consistently with the guarantees of a free press. *Id.*

In *Memphis Publishing Co. v. Leech,* the court invalidated a Tennessee statute which required certain newspapers within the state to include, in every advertisement placed by out-of-state liquor retailers, a 40–word warning regarding the illegal nature of transporting alcoholic beverages into the state without a permit. The court found that the statute imposed a penalty in terms of print or column space occupied by the warning rather than "preferred copy," and concluded that the state-imposed choice between foregoing such copy or the affected advertisements was an intrusion on edi-

---

11. The Court also found no violation of the free speech clause, since each non-exempt employment advertisement proposed an illegal transaction. 413 U.S. at 388–89, 93 S.Ct. at 2560–61. *See Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) (citing

*Pittsburgh Press*) (Commercial speech which proposes an illegal transaction receives no first amendment protection.). *See also Posadas De Puerto Rico Assoc. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 2981, 92 L.Ed.2d 266 (1986) (Brennan, J., dissenting) (same).

torial discretion which was disapproved in *Miami Herald.* 539 F.Supp. at 410.[12]

Taking their cue from the *Memphis Publishing* opinion and the sweeping language of *Miami Herald,* Plaintiffs have argued that *Miami Herald* effectively invalidated *Pittsburgh Press.* Any governmental compulsion of what a newspaper must print, or any similar governmental intrusion into the editorial process, is, in Plaintiffs' view, prohibited.

Plaintiffs have, however, overstated the effect of the *Miami Herald* decision. Though the *Miami Herald* Court stressed the narrow bounds of the holding in *Pittsburgh Press,* see 418 U.S. at 255–56, 94 S.Ct. at 2838–39, those bounds were not completely discarded. As Justice White recognized, some power still resided in government "to influence the publishing of certain narrowly circumscribed categories of material." *Miami Herald,* 418 U.S. at 261, 94 S.Ct. at 2841 (White, J., concurring) (citing *Pittsburgh Press* and *New York Times Co. v. United States,* 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (White, J., concurring)). This power did not, and never had been thought to, include the power to dictate the contents of news columns or the slant of editorials, but did include the limited intrusion on editorial judgment which was upheld in *Pittsburgh Press. See id.*[13]

Factually, this case is much closer to *Pittsburgh Press* than to *Miami Herald* in terms of the level of intrusion on editorial judgment. Ordinance 86–36 does require the publishing of certain information, at least in some instances, but that compulsion cannot be said to restrict the content of news columns or the slant of editorials. The Ordinance does not affect political speech,[14] blunt the free discussion of governmental affairs, or in any way appear to be intended to censor the press.

Though somewhat similar to *Pittsburgh Press,* this case is, nonetheless, distinguishable. The editorial judgment intruded upon in that case was the adoption and adherence to an advertising layout policy adopted by the publisher which had aided in the commission of unlawful employment practices. In contrast, Plaintiffs herein cannot be said to have employed a policy which affirmatively or directly aided in the incompetent or fraudulent provision of contracting services. Plaintiffs do not, in fact, employ any special policy concerning contracting advertisements beyond placing such advertisements within the service directories and allowing its sales representatives to choose the appropriate classified header.

The effect of Ordinance 86–36 is, of course, to impose the County's policy on Plaintiffs concerning contracting advertisements. Whether this intrusion on editorial

**12.** The court also concluded that the Tennessee statute invalidly restrained commercial speech and denied plaintiffs of equal protection. 539 F.Supp. 411–13. Though reference was made to the argument that the statute unconstitutionally appropriated the media to enforce public policy, *id.* at 409, it is unclear whether this theory served as a basis of the court's decision. This theory was discussed in regard to *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), a case which contains both free speech and free press elements. *See id.* at 828, 95 S.Ct. at 2235 (More serious first amendment overtones involved, since statute applied against the editor and publisher of a newspaper, rather than the advertiser.).

**13.** *Pittsburgh Press* has not been invalidated, as Plaintiffs' have also suggested, by the subsequent (further) development of the commercial speech doctrine. The *Pittsburgh Press* Court recognized that commercial speech enjoys a degree

of first amendment protection, *Bigelow,* 421 U.S. at 821, 95 S.Ct. at 2232, but rejected any abrogation of the distinction drawn between commercial speech and other forms of speech. *Pittsburgh Press,* 413 U.S. at 388–89, 93 S.Ct. at 2560–61. The Court has continued to recognize "the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Central Hudson,* 447 U.S. at 562, 100 S.Ct. at 2349 (quoting *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978)).

**14.** *See Brown v. Hartlage,* 456 U.S. 45, 52–54, 102 S.Ct. 1523, 1528–29, 71 L.Ed.2d 732 (1982) (First Amendment has its fullest application in regard to government regulation of political speech.). Under *Central Hudson,* commercial speech receives a limited form of first amendment protection. *Posadas,* 106 S.Ct. at 2976.

judgment and control would be permissible in the absence of the costs of complying with the Ordinance is unclear. What is clear, however, is that under both *Miami Herald* and *Pittsburgh Press* the imposition of such a "penalty" is not permitted by the First Amendment.[15] The thrust of the First Amendment guarantee is to protect the press from governmental action which undermines, or threatens to undermine, its institutional viability. Such a threat can be posed by censorship or other attempts to interfere with editorial control and judgment as to the content (or layout) of news columns and the slant of editorials.

The proper functioning of the press can also be threatened, however, by the less direct intrusions into the editor's domain which can occur, in Justice Powell's words, when legislation threatens a newspaper's financial viability or impairs in any significant way its ability to publish and distribute its material. Such legislation can act to muzzle or curb the press as effectively as the censor, whether it be accomplished through differential taxation, *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1371, 75 L.Ed.2d 295 (1983); *Grosjean v. American Press Co.*, 297 U.S. 233, 249–250, 56 S.Ct. 444, 448–449, 80 L.Ed. 660 (1936), imposing penalties based on newspaper content, *Miami Herald, supra,* or, as in this case, shifting the burden of enforcing the law from the taxpayer to the press. This does not mean that the press cannot be subjected to generally applicable economic regulations, but that the press may not be singled out to bear special burdens. *See Minneapolis Star*, 460 U.S. at 581–85, 103 S.Ct. at 1369–72; *Legi–Tech v. Keiper, Inc.*, 766 F.2d 728, 734 (2d Cir. 1985) (discussing *Minneapolis Star*). *See also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (Would-be regulators must bear the costs of distinguishing truthful advertising from false and deceptive advertising.)

This prohibition against differential or discriminatory treatment of the press extends beyond tax legislation, *Associated Film Distribution Corp. v. Thornburgh*, 800 F.2d 369, 374–75 (3d Cir.1986); *Legi–Tech*, 766 F.2d at 734–35, and such treatment of the press and consequent burdening of first amendment rights can be established even where, as here, there is no evidence of an improper censorial motive. *Arkansas Writers' Project, Inc. v. Ragland*, —— U.S. ——, 107 S.Ct. 1722, 1726–27, 95 L.Ed.2d 209 (1987) (citing *Minneapolis Star*, 460 U.S. at 579–580, 592, 103 S.Ct. at 1368–1369, 1375).

Although the financial cost is not overwhelming, the burden placed on the press by Ordinance 86–36 to enforce the underlying ordinances cannot be said to be insignificant. This is particularly true in light of the substantial staff time required on Plaintiff NSS' part, and presumably of other publishers, to comply with the Ordinance. The cost of such labor will, furthermore, be recurring and subject to inflation.

Beyond the burden imposed by Ordinance 86–36, the possible imposition of additional burdens by the County (or the State) must also be considered in order to fully gauge the Ordinance's constitutional implications. *See Minneapolis Star*, 460 U.S. at 588, 103 S.Ct. at 1373; *Bigelow v. Virginia*, 421 U.S. 809, 828–29, 95 S.Ct. 2222, 2235–36, 44 L.Ed.2d 600 (1975); *Grosjean*, 297 U.S. at 244–45, 56 S.Ct. at 446–47. The County might, for example, place similar duties on the press concerning other types of services or other types of advertising directed at consumers.[16] Other counties might do the same.[17] The State could, of course, pass legislation similar to Ordinance 86–36, a practice which could

---

**15.** The ordinance upheld in *Pittsburgh Press* did not impose a penalty on the publisher. *See* 413 U.S. at 383, 93 S.Ct. at 2557 (no evidence in record to support contention that penalty imposed by ordinance) and 390 n. 14, 93 S.Ct. at 2561 n. 14 (newspaper permitted to rely on good faith representation of advertiser that exemption to ordinance applicable).

**16.** See note 3, *supra.*

**17.** The parties have advised the court that similar ordinances are in existence in Dade County and Palm Beach County (Broward's neighboring counties to the north and south.)

spread to other states. *Bigelow*, 421 U.S. at 829, 95 S.Ct. at 2236. The cumulative burden which might be placed on publications by such legislation "would impair, perhaps severely, their proper functioning." *Id.* The threat presented by Ordinance 86–36 is, then, not only to the ability of the *Fort Lauderdale News*, the *Sun-Sentinel*, or other Broward County publications to publish and distribute their material, but, ultimately, to the institutional viability of the press as a whole.

The interest asserted by the County in this case—protecting the public from incompetent and dishonest contractors—is, it will be assumed, a substantial one. But however substantial, even compelling, that interest might be, it will not serve to justify the Ordinance's infringement of the freedom of the press, since it could be achieved through less intrusive means. Those means are, in fact, readily available to the County, and, for all practical purposes, already in place. The Consumer Affairs Division could simply step up its review and investigation of contractor advertisements and citizen's complaints to ensure compliance with the underlying ordinances. In fact, contractor advertisements must still be reviewed under Ordinance 86–36 in order to monitor the press' compliance with the Ordinance, and such action would be necessary even if the County abandoned all efforts to enforce the underlying ordinances on its own part.

**18.** See note 10, *supra.*

**19.** Having concluded that Ordinance 86–36 violates the first amendment guarantee of a free press, the court will not rule on Plaintiffs' claim that the Ordinance invalidly restricts commercial speech in order to avoid commenting on the constitutionality of the underlying ordinances, which have not been challenged here. Plaintiffs have also claimed that Ordinance 86–36 violates the Equal Protection Clause, but have not presented any evidence or argument in support of that claim. Even if that claim has not been abandoned or waived, the appropriate analysis is under the First Amendment, rather than the Fourteenth, since Ordinance 86–36 directly implicates free press concerns. *Arkansas Writers' Project*, 107 S.Ct. at 1726 n. 3; *Minneapolis Star*, 460 U.S. at 585 n. 7, 103 S.Ct. at 1372 n. 7.

 Full enforcement of the underlying ordinances may be costly and difficult for the County[18], perhaps more so in the absence of the scheme created by Ordinance 86–36, but the First Amendment, applicable to the States through the Fourteenth Amendment, *Grosjean*, 297 U.S. at 244, 56 S.Ct. at 446, prohibits the County from singling out the press to bear the burden of that enforcement. The County's purpose may not be improper, but the means it has chosen are, and, consequently, Ordinance 86–36 impermissibly infringes upon the freedom of the press.[19]

A judgment consistent with this decision shall accordingly be entered this same day.

Plaintiffs have also claimed that Ordinance 86–36 is unconstitutionally vague and overbroad. The overbreadth doctrine does not apply, however, to commercial speech, *Bates v. State Bar of Arizona*, 433 U.S. 350, 380–81, 97 S.Ct. 2691, 2707–08, 53 L.Ed.2d 810 (1977); and where the overbreadth test is satisfied or inapplicable, a void-for-vagueness challenge cannot, for all practical purposes, be made successfully. *See Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494–95 and 497, 102 S.Ct. 1186, 1191–92 and 1192, 71 L.Ed.2d 362 (1982) (Where overbreadth challenge fails, void-for-vagueness challenge can succeed only if the law is impermissibly vague in all of its applications). *See also Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983) (Vagueness and overbreadth are logically related and similar doctrines.)