LEGI–TECH, INC., Plaintiff,

v.

David W. KEIPER and John J. Faso, as Commissioners of the Legislative Bill Drafting Commission of the State of New York; Warren Anderson, as Temporary President of the Senate of the State of New York; Stanley Fink, as Speaker of the Assembly of the State of New York; and Mario Cuomo, as Governor of the State of New York, Defendants.

No. 84–CV–1256.

United States District Court,
N.D. New York.

Dec. 4, 1984.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., Pattison, Sampson, Ginsberg & Griffin, P.C., Troy, N.Y., for plaintiff; Terrence J. Leahy, Washington, D.C., Jeffrey R. Armstrong, Troy, N.Y., of counsel.

Robert Abrams, Atty. Gen. of the State of New York, Albany, N.Y., for defendants; Alan S. Kaufman, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MINER, District Judge.

### I

This action arises out of alleged multiple constitutional violations stemming from defendants' recent introduction of a "Legislative Retrieval Service" ("LRS") and plaintiff's exclusion from access thereto. The action is brought pursuant to 42 U.S.C. § 1983 and jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343. Before the Court is plaintiff's motion for a preliminary injunction, Fed.R.Civ.P. 65. The following represents the Court's findings of fact and conclusions of law as required by Fed.R. Civ.P. 52(a).

### II

Plaintiff Legi-Tech is a California corporation offering to the public a news service known as the "Legi-Tech System," which disseminates to subscribers by electronic means a variety of information regarding state legislative activity. The system offers summaries of legislation, transmits the recorded votes on each bill, provides the attendance record of each state legislator, and indicates the amount of contributions given by lobbyists to particular legislators. Legi-Tech provides computer terminals to subscribers to enable them to receive the service. Some of Legi-Tech's customers include news media, lobbyists, major corporations, and state and local agencies. Traditionally, in order to prepare its news data for distribution to its subscribers, Legi-Tech has obtained the printed ver-

sion of each legislative bill and the summary memorandum prepared by the legislator who sponsored the bill. It accumulates additional information by having its staff monitor the proceedings of the legislature in person.

In January of 1984, the Legislative Bill Drafting Commission of the State of New York ("Commission") instituted a pilot project to determine the feasibility of its LRS system for the transmission of legislative information to computers located on subscribers' premises. According to plaintiff, LRS is the only available method of obtaining the text of New York bills on the same day they are introduced. Moreover, plaintiff contends that during the period between the time a bill is introduced and the legislature makes available a printed copy of the complete text, LRS is the exclusive source of the exact text of pending legislation. The lag-time before printing is alleged to range from two days to two weeks, during which period only LRS subscribers are capable of learning the text of legislative proposals.

Seeing the potential for enhancement of Legi-Tech's services, its president wrote to defendants David W. Keiper and John J. Faso, members of the Commission, requesting access to LRS. On February 22, 1984, Keiper and Faso responded that they were "not accepting any new applicants to [the] pilot project at this time" because the "customer population has exceeded the amount designated for this stage of the project." Complaint, ¶ 17. In March, Legi-Tech again sought access to LRS but to no avail. The service was made available to the public on April 1, 1984, and Legi-Tech continued to seek access. Those efforts culminated in an Article 78 petition filed in New York State Supreme Court on June 1, 1984, seeking an order requiring the Commission to offer LRS to Legi-Tech in the same manner and on the same terms as offered to other subscribers.

On June 7, 1984, legislation was introduced in the New York State Legislature establishing a fund to consist of revenues derived from, *inter alia*, the sale of electronic legislative information services. The bill, known as "Chapter 257," was signed into law on June 25, 1984. Chapter 257 establishes a "Legislative Computer Services Fund" consisting of revenues received by the legislature from the sale of electronic data processing services or charges for publications of statutes. Central to the present litigation is the bill's additional provision that:

> Notwithstanding any provision of law to the contrary, the legislature is hereby authorized to engage in the sale of any of the foregoing services, programs or materials to such entities as the temporary president of the senate and speaker of the assembly, in their joint discretion, deem appropriate, *except those entities which offer for sale the services of an electronic information retrieval system which contains data relating to the proceedings of the legislature.*

(emphasis added).

According to its complaint, Legi-Tech is the only entity other than LRS that offers to the public an information retrieval service that provides summaries of pending New York bills. Moreover, plaintiff claims that it is the only entity to which the Commission has refused to provide access to LRS, even though it is willing and able to pay the service's fees. The gravamen of plaintiff's complaint is that the statutory exception in Chapter 257 was enacted for the specific purposes of legitimizing defendants' refusal to offer LRS service to Legi-Tech, enhancing the competitive position of LRS vis-a-vis Legi-Tech, and impairing the ability of Legi-Tech to offer a competing legislative information service. In particular, plaintiff challenges the facial and as-applied constitutional validity of Chapter 257, and raises a host of constitutional challenges to defendants' actions, viz., (1) that defendants' actions deny plaintiff and others freedom of speech and freedom of the press, in violation of the first and fourteenth amendments; (2) that defendants have denied plaintiff equal protection in violation of the fourteenth amendment; (3) that defendants have denied

plaintiff its right to due process; and (4) that Chapter 257 is a bill of attainder violating art. I, § 10, cl. 1 of the United States Constitution.[1] In the nature of relief, plaintiff seeks a declaration of the invalidity of Chapter 257, preliminary and permanent injunctions, and actual and punitive damages.

### III

■ The standard for preliminary injunctive relief in this circuit requires that the moving party demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly ..." in its favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see also Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). A review of the claims raised here convinces this Court that plaintiff has failed to demonstrate its entitlement to the extraordinary remedy it seeks.

### A. *Irreparable Harm*

According to plaintiff, "[e]ach day that [it] is denied access to LRS, it suffers incalculable injury to its constitutional rights of communication and freedom of expression." Plaintiff's Memorandum of Law in Support of Application for Preliminary Injunction at 42–43. There can of course be no question that a denial of first amendment rights constitutes irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). Defendants do not, nor could they, dispute this proposition, other than to argue that reliance on a theory of first amendment deprivation as a predicate for a showing of irreparable harm only begs the question, since plaintiff has not established any first amendment injury. Suffice it to note that if plaintiff could establish a first amendment violation, it would be able to satisfy both prongs of the preliminary injunction standard. Because this Court concludes, however, that there remain, at the very least, serious questions concerning the existence of any first amendment deprivations, and because those questions must be answered prior to a determination that plaintiff has established the requisite irreparable harm, consideration must be directed to the second prong of the preliminary injunction showing.

### B. *Likelihood of Success on the Merits*

Plaintiff launches a sweeping attack on the constitutional validity of its exclusion from LRS. While the Court joins in plaintiff's deep and commendable concern for the protection of fundamental first amendment values, plaintiff's generous reading of first amendment jurisprudence requires an indulgence to which this Court cannot subscribe. In short, plaintiff's ardent plea for access suggests only a most attenuated claim under the first amendment.

■ According to plaintiff, this is a case about access to information. At the outset, then, it is important to note that the first amendment does not guarantee access by the general public or the media to government property or information. The Supreme Court "has never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 98 S.Ct. 2588, 2593–94, 57 L.Ed.2d 553 (1978). While "[t]here is an undoubted right to gather news 'from any source by means within the law,' ... that affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information." *Id.* at 11, 98 S.Ct. at 2594–95 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681–82, 92 S.Ct. 2646, 2656–57, 33 L.Ed.2d 626 (1972)). Moreover, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965).

The recent analysis of "access jurisprudence" undertaken by the Second Circuit in *In re Application of The Herald Co.*, 734

---

1. Plaintiff's complaint alleges as well a number of state constitutional violations.

F.2d 93 (2d Cir.1984), is instructive. After an exhaustive discussion of the four significant Supreme Court cases,[2] *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Gannett Co. v. De-Pasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), the court recognized "a difference between a right of access and a right of expression." 734 F.2d at 100. The court continued:

> Without doubting the relevance of the former to the latter, we find nothing in the terms or tradition of the First Amendment that would accord as stringent protection to access as to speech. The freedom to speak is at the core of the First Amendment. Impairment of that right threatens the most fundamental of constitutional values. Abridgement of free speech not only silences one speaker, it also inhibits others from exercising their rights of expression. Denial of access, however, though preventing discussion of the withheld information, exerts no chilling effect upon free discussion generally. If anything, denial of access spurs efforts to elicit information, sometimes heightening awareness of and interest in the very topic on which details have been withheld.
>
> To claim a value in access to information, even information concerning significant governmental activities, comparable to the value of freedom of expression, is to ignore 200 years of First Amendment jurisprudence.... The recognition of some form of First Amendment access

right in *Richmond Newspapers* [448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973] was recognized as a "watershed" decision. We see no indication in that decision or the subsequent cases that a majority of the Supreme Court is prepared to accord to this newly minted right the same degree of protection historically accorded to free expression.

*Id.*

■ There can be no question that here, plaintiff is not even being denied access to information; rather, it is merely being required to gather the information it seeks in a manner which it finds to be less convenient.[3] Plaintiff continues to be able to gather the legislative materials it desires, *see* affidavit of John J. Faso, ¶ 11, and to disseminate them as it sees fit. The Court finds absolutely no significance in the fact that Legi-Tech must obtain the information it seeks by a means other than LRS. First, "the information plaintiff seeks ... is readily available if plaintiff expends the time and energy to collect that information...." *Herald Company v. McNeal,* 511 F.Supp. 269, 273 (E.D.Mo.1981) (three-judge court). Second, there cannot be found to exist any special privilege entitling plaintiff or the public to such particularized access. Support for this conclusion is drawn from the Second Circuit's recent decisions upholding, in the face of constitutional attacks, courtroom restrictions barring television cameras and other recording devices. *See Westmoreland v. Columbia Broadcasting System, Inc.,* 752 F.2d 16 (2d Cir.1984); *United States v. Yonkers Board of Education,* 747 F.2d 111 (2d Cir.1984). Acknowledging a right of access by the public to even civil trials, Judge Oakes, speaking for the *Westmoreland* panel, nonetheless re-

**2.** Since the time of the *Herald* decision, the Supreme Court has decided *Waller v. Georgia,* —— U.S. ——, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), extending a defendant's sixth amendment right to a public trial to a pre-trial suppression hearing. That decision, however, does not weaken the conclusions reached by the *Herald* panel.

**3.** Indeed, according to defendants,

the real reason plaintiff brought this action was set forth in paragraph 22 of the plaintiff's Article 78 petition in State Supreme Court:

Legitech, [sic] Inc. is anxious to subscribe to the Legislative Retrieval System in order to make use of the convenience of having the original texts of bills immediately become part of the database offered to its many subscribers.

Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 16.

jected the existence of a right to a particular *type* of access. In response to the argument that access without television could not be completely effective because all those desirous of attending might not be accommodated and because reading about the trial through newspaper accounts or the transcript itself necessitated delay, thereby relegating the public to "'qualitatively inferior, stale and wooden interpretations of what occurred,'" at 23, Judge Oakes noted:

> There is a long leap, however, between a public right under the First Amendment to attend trials and a public right under the First Amendment to see a given trial televised. It is a leap that is not supported by history. It is a leap that we are not yet prepared to take.

*Id.* Because plaintiff is able to obtain and distribute the information it seeks, it is difficult for this Court to fathom any first amendment violation.

Plaintiff raises a number of arguments in support of its first amendment claims, none of which this Court finds persuasive. First, plaintiff contends that the Constitution prohibits New York from subjecting it to regulatory burdens that are not shared by the citizenry as a whole. Plaintiff's reliance on *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), and *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), is grossly misplaced. First, unlike the statutes at issue in those cases, Chapter 257 is not in any sense a regulatory or tax statute. More importantly, however, those cases "dealt only with government attempts to burden and restrain a newspaper's communication with the public. The reference [in *Grosjean* ] to a public entitlement to information meant no more than that the government cannot restrain communication of whatever information the media acquire—and which they elect to reveal." *Houchins v. KQED, Inc.*, 438 U.S. at 10, 98 S.Ct. at 2594. The challenged statute here in no way deprives plaintiff of access to any information. Nor does it restrict plaintiff's ability to publish

any information it desires. The Court rejects plaintiff's contention that defendants have deprived Legi-Tech of constitutionally guaranteed access to legislative information. As defendants have noted, "plaintiff is not being denied 'access to information on legislative proceedings' [but] is simply being denied the information in a form that could easily be redistributed and put LRS out of business. Plaintiff could obtain the same information through other sources which, prior to this suit, it did not choose to do." Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 34.

Anticipating defendants' argument that "Legi-Tech's ability to obtain and disseminate information on legislative activities is no greater or less than it was before the state launched LRS," Plaintiff's Memorandum of Law in Support of Application for Preliminary Injunction at 19, plaintiff suggests that that argument is neither legally nor factually persuasive. First, plaintiff contends that "it is settled that freedom of speech may not be abridged on the ground that the speaker's listeners could obtain the message by other means." *Id.; see Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council*, 425 U.S. 748, 757 & n. 15, 96 S.Ct. 1817, 1823 & n. 15, 48 L.Ed.2d 346 (1976). Second, plaintiff contends that there are no alternative sources of information available to it. In particular, plaintiff claims that (1) during the time gap between the introduction of a bill and its availability in print, LRS is the only source of a bill's exact text; (2) no LRS subscriber could telecommunicate to Legi-Tech the information it receives from LRS without itself risking termination of its LRS service; (3) the information available through LRS is uniquely valuable, since the defendants themselves have admitted that their bill summaries are superior to any other; and (4) the refusal by the defendants to provide equal access to this technological breakthrough is "intolerable." The Court does not agree. First, plaintiff's reliance on the argument that freedom of speech may not be abridged on

the ground that the *speaker's* listeners could obtain the message by other means is misplaced. This is simply not a case of a limitation being imposed on plaintiff's speech. It involves rather only a reasonable restriction on plaintiff's access to a state owned means of conveying such information. *See Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972) (alternative means of access *may* be a relevant factor in "extinguish[ing] ... constitutional interest ... in particular form of access"); *cf. Members of the City Council v. Taxpayers for Vincent,* — U.S. —, 104 S.Ct. 2118, 2132–33, 80 L.Ed.2d 772 (1984) ("[w]hile the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate" (citations omitted)). *But see Westmoreland v. Columbia Broadcasting System, Inc.,* 752 F.2d 16, 22, No. 84–7809, slip op. at 249 (2d Cir. Nov. 2, 1984) ("It may also be true that the *public's* right to *receive* information may not be vitiated by appeals to the availability of alternative means for receipt of the information." (emphasis added) (citing *Kleindienst,* 408 U.S. at 765, 92 S.Ct. at 2583)).

Second, plaintiff's claim that there are no alternative sources of information available to it simply is not true. LRS is not the only source of a bill's exact text between the time of its introduction and its printing. The affidavit of defendant John J. Faso, submitted in support of defendants' motion to dismiss the complaint, notes that typewritten copies of bills can on most occasions be obtained prior to printing by requesting a copy from the bill's sponsor. The Faso affidavit also indicates the availability of bills under Assembly Rule III, § 2(a) which provides that "[o]ne copy of each bill shall, on the day of its introduction, be sent by the Index Clerk to the printer, one copy to the Revision Clerk, which copy shall be subject to public inspection when not in actual use by the committee and the third copy to the Legislative Index Company." Faso affidavit, ¶ 11 at 5. Finally, the Faso affidavit makes clear that a direct and convenient method of receiving a typewritten copy of a bill upon its introduction is through the Legislative Index Company ("LIC"). Under the rules of both houses of the Legislature, a typewritten copy of every bill and amendment is given to the LIC at the time of introduction. Apparently, LIC offers a subscription service for a fee which provides copies of typewritten bills immediately following their introduction. In any event, bill summaries prepared by the Commission are published in the Legislative Digest the day after introduction and are there available for plaintiff's purchase.

■ Plaintiff's claim that defendants have erected an impermissible content-based restriction on speech is equally unpersuasive. Again, the critical flaw in plaintiff's argument may be seen in the fact that defendants have not imposed upon plaintiff *any* restriction on expression, content-based or otherwise. Moreover, to the extent that plaintiff's access to information has been made somewhat more difficult, the characterization of such as content-based is entirely inaccurate. Plaintiff is not being foreclosed from access to LRS because of the content of its intended message but rather because of the form in which it seeks to obtain the message and the format in which it chooses to distribute that message. Certainly, plaintiff is not precluded from disseminating the precise message it seeks to send as long as it obtains the information from a source other than LRS. For similar reasons, plaintiff's claim that Chapter 257 "creates a content-based prior restraint on the expression of particular types of information by particular means," also is rejected.

■ Plaintiff next raises claims that Chapter 257 is both unconstitutionally vague and overbroad. Unlike an overbreadth challenge, a vagueness challenge may not be maintained by one to whose conduct a statute clearly applies. *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547,

2561, 41 L.Ed.2d 439 (1974); *see also Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).[4] With respect to overbreadth, plaintiff urges that Chapter 257 "could be interpreted to apply to any news organization, research service or other organization that electronically disseminates information about state legislation to others—regardless of whether that activity in fact poses a competitive threat to the economic viability of the state's LRS, the presumed purpose behind the statute." Plaintiff's Memorandum of Law in Support of Application for Preliminary Injunction at 28. It is indisputably true that a law is void on its face if it "does not aim specifically at evils within the allowable area of [government] control but, ... sweeps within its ambit other activities that ... constitute an exercise" of protected rights of expression. *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940). It is equally true, however, that the "doctrine is 'strong medicine' and [has been] employed ... with hesitation, and then 'only as a last resort.'" *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)). In consequence, the Supreme Court has "insisted that the overbreadth involved be 'substantial' before the statute involved will be invalidated on its face." *New York v. Ferber,* 458 U.S. at 769, 102 S.Ct. at 3361 (footnote omitted); *see also Secretary of State of Maryland v. Joseph H. Munson Co.,* — U.S. —, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984); *Members of the City Council v. Taxpayers for Vincent,* — U.S. —, 104 S.Ct. 2118, 2125–26, 80 L.Ed.2d 772 (1984). Indeed,

the Court has noted that "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. at 615, 93 S.Ct. at 2918; *see also Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974) ("This Court has ... repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct ....'" (quoting *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973)).

■ The purpose underlying the overbreadth doctrine exposes the fallacy in plaintiff's challenge. As explained by the Supreme Court in *New York v. Ferber,* "[t]he doctrine is predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.'" 458 U.S. at 768, 102 S.Ct. at 3361 (quoting *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980)). It can hardly be the case that Chapter 257 can in

---

4. An overbreadth challenge in the first amendment context does of course afford standing even to a plaintiff who, like Legi-Tech, falls clearly within the statute's ambit. "[W]here the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and 'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite specificity.'"

*Secretary of State of Maryland v. Joseph H. Munson Co.,* — U.S. —, 104 S.Ct. 2839, 2847–48, 81 L.Ed.2d 786 (1984) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973)). This is because facial challenges to statutes "are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." 104 S.Ct. at 2848.

any manner be seen to deter speech. First, as discussed above, and as conceded by plaintiff, speech is not even at issue; rather, the question is only one of convenient access. Second, and perhaps more important, the statute does not proscribe or even regulate speech. It simply controls one method of access to government information. Because speech is not regulated, there can be no overbreadth challenge. A party either is or is not covered by the statute and respectively may not or may subscribe to LRS. It is irrelevant that a subscriber who engages in what plaintiff here seeks to engage in will lose its subscription rights since that would stem not from the statute itself but rather from the terms of the subscription agreement. Simply stated, since Chapter 257 cannot possibly deter speech because of questions concerning its possible reach, it cannot be found to be overbroad.

The question of access aside, a number of important Supreme Court cases make it abundantly clear that the statute under attack here suffers no other first amendment infirmity. First, it must be acknowledged that LRS is not a forum created by the government to which plaintiff is entitled to access. In *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981), the Court considered a challenge to a federal statute making it a crime to deposit any mailable matter without postage in mailboxes. The plaintiffs contended that enforcement of the statute would deny them their first amendment freedoms. In rejecting the challenge, the Supreme Court relied largely on its view that a letterbox was not a public forum "to which the First Amendment guarantees access ...." 453 U.S. at 128, 101 S.Ct. at 2685. In particular, the Court held:

> There is neither historical nor constitutional support for the characterization of a letterbox as a public forum.... As such, it is difficult to accept appellees' assertion that because it may be somewhat more efficient to place their messages in letterboxes there is a First Amendment right to do so....

Indeed, it is difficult to conceive of any reason why this Court should treat a letterbox differently for First Amendment access purposes than it has in the past treated the military base in *Greer v. Spock*, 424 U.S. 828 [96 S.Ct. 1211, 47 L.Ed.2d 505] (1976), the jail or prison in *Adderley v. Florida*, 385 U.S. 39 [87 S.Ct. 242, 17 L.Ed.2d 149] (1966), and *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 [97 S.Ct. 2532, 53 L.Ed.2d 629] (1977) or the advertising space made available in city rapid transit cars in *Lehman v. City of Shaker Heights*, 418 U.S. 298 [94 S.Ct. 2714, 41 L.Ed.2d 770] (1974). In all these cases, this Court recognized that the First Amendment does not guarantee access to property simply because it is owned or controlled by the government. In *Greer v. Spock, supra,* the Court cited approvingly from its earlier opinion in *Adderley v. Florida, supra,* wherein it explained that " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " 424 U.S. at 836 [96 S.Ct. at 1216–17].

453 U.S. at 128–30, 101 S.Ct. at 2685 (footnote omitted).

The Supreme Court addressed a similar issue more recently in *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). There, the Court upheld the constitutionality of a provision in a collective bargaining agreement between a school district and the teachers' exclusive bargaining representative granting the bargaining representative exclusive access to teacher mailboxes and the interschool mail system to the exclusion of a rival union. The primary question framed by the Court is similar to one presented here, viz., "whether the First Amendment ... is violated when a union that has been elected by public school teachers as their exclusive bargaining representative is granted access to certain means of communication, while such access is denied to a rival union." 103 S.Ct. at 954. Noting that "[t]he existence

of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue," *id.*, the Court proceeded to detail the three categories of public property and the different first amendment rights attendant upon each. *See* 103 S.Ct. at 954–55.

It is beyond question that LRS, like the school mailboxes in *Perry*, does not fall within the first category of "quintessential public forums," places which "by long tradition or by government fiat have been devoted to assembly and debate," *id.*, and where "the rights of the state to limit expressive activity are sharply circumscribed," *id.* Nor may LRS be said to fall within the second category of property which the state has opened for use by the public as a place for expressive activity. The analysis of the *Perry* Court is directly applicable here. In finding that the school mailboxes were not within this second category, the Court took note of a number of important factors. First, it recognized that if "by policy or by practice the Perry School District has opened its mail system for *indiscriminate* use by the general public, then PLEA could justifiably argue a public forum has been created," 103 S.Ct. at 956 (emphasis added), but found such not to be the case, since permission to use the system had to be first secured from a principal. The Court held that "[t]his type of selective access does not transform government property into a public forum." *Id.; see also Greer v. Spock*, 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1976). Here too, by the very terms of Chapter 257, access to LRS is selective in that it is contingent upon approval by the temporary president of the senate and the speaker of the assembly. The *Perry* Court also noted that even if the granting of access to certain groups created a "limited" public forum, "the constitutional right of access would in any event extend only to other entities of similar character." 103 S.Ct. at 956. Here, since Legi-Tech, as a competitor of the State, is not of the same character as other sub-

scribers, the denial of access to it cannot be questioned.

 LRS, like the school mailboxes, is therefore subject to only the limited constitutional demands placed upon public property falling within the third category. Generally, "[i]n addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." 103 S.Ct. at 955. The Supreme Court's analysis of the school mailbox restriction is instructive here:

> Because the school mail system is not a public forum, the School District had no "constitutional obligation per se to let any organization use the school mail boxes."
>
> The differential access provided PEA and PLEA is reasonable because it is wholly consistent with the district's legitimate interest in "preserv[ing] the property ... for the use to which it is lawfully dedicated." ... Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.
>
> Finally, the reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. These means range from bulletin boards to meeting facilities to the United States mail....

103 S.Ct. at 957, 958, 959 (citations and footnote omitted).

This Court has little difficulty concluding that New York's LRS also cannot have ascribed to it the attributes of a public forum. Because no public forum is involved, the property owned by the state may be subject to even a prohibition of speech, as long as the state acts reasonably in imposing such restrictions and the restrictions are content-neutral. *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. at 131 n. 7, 101 S.Ct. at 2686 n. 7. There is no question that the regulation here is reasonable since it only seeks to protect the state's natural monopoly on computer supplied legislative information. Indeed, were the state not able to restrict access to LRS, competitors could easily retransmit the state's data at lower prices and thereby eliminate LRS entirely. Without question, the effect of such would surely be to decrease the immediate availability of information to the public. *United States Postal Service v. Greenburgh* itself acknowledged the right of Congress to create the postal monopoly to prevent competition from private express services, 453 U.S. at 122, 101 S.Ct. at 2681, and implicitly sanctioned Congress' efforts to stop a practice that was " 'depriving the Post Office Department of considerable revenue on matter which would otherwise go through the mails....' " *Id.* at 125, 101 S.Ct. at 2683 (quoting H.R.Rep. No. 709, 73d Cong., 2d Sess., 1 (1934)).[5]

Nor can there be any question that Chapter 257 is content-neutral. Access to LRS is prohibited to entities like plaintiff that are competitors not because of the content but because of the technology of the communication used. It is without doubt absurd to characterize as content-based the restriction imposed by Chapter 257; the precise information sought to be disseminated by plaintiff is already provided by defendants. It is only the manner in which the dissemination is effected that could possibly interest defendants.

Finally, of some relevance is the Supreme Court decision in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), involving a challenge to a city's prohibition of political advertising on its public transportation system. The Court upheld the restriction, finding that no public forum had been created, notwithstanding the fact that commercial advertising was accepted:

Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker Heights. The car card space, although incidental to the provision of public transportation, is a part of the commercial venture. In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles. In making these choices, this Court has held that a public utility "will be sustained in its protection of activities in public places when those activities do not interfere with the general public convenience, comfort and safety."

Because state action exists, however, the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious. Here, the city has decided that "[p]urveyors of goods and services saleable in commerce may purchase advertising space on an equal basis, whether they be house builders or butchers." This decision is little different from deciding to impose a 10–, 25–, or 35-cent

---

5. Although the *Greenburgh* decision involved the "broad power of Congress to act in matters concerning the posts ...," 453 U.S. at 126, 101 S.Ct. at 2683; *see Ex parte Jackson*, 96 U.S. (6 Otto) 727, 732, 24 L.Ed. 877 (1878), its analysis is nonetheless applicable here, since "[h]owever broad the postal power conferred by Art. I may be, it may not of course be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment to the Constitution." 453 U.S. at 126, 101 S.Ct. at 2684.

fare, or from changing schedules or the location of bus stops.... In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation. Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.

No First Amendment forum is here to be found. The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity. In these circumstances, there is no First or Fourteenth Amendment violation.

418 U.S. at 303–04, 94 S.Ct. at 2717–18. Here too, the state is involved in a commercial venture. Chapter 257 represents merely an attempt to ensure the survival of that venture by proscribing sales to competitors. *Lehman* is significant in that it makes clear that when the state acts in its proprietary or commercial capacity, the raising of revenue is a significant and perhaps compelling interest and the state's action is subject to less exacting scrutiny. *See Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767 at 775 (2d Cir.1984); *Post Newsweek Stations Connecticut, Inc., v. Travelers Insurance Co.,* 510 F.Supp. 81, 86 (D.Conn.1981).

Finally, the Court must briefly address the flurry of post-argument submissions prompted by defendants' forwarding to the Court a copy of the recently decided case of *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767 (2d Cir.1984). Both plaintiff and defendants have gone to some effort to point out to the Court the relevance of that case to their respective positions. Not surprisingly, each views the circuit's determination as dispositive, although with different results. The Court has reviewed the *Gannett* decision and considered the parties' explication of it and concludes that the decision's relevance is marginal at best.

## IV

With respect to a first amendment violation, this Court is persuaded that none has been shown. As stated by defendants, "plaintiff is not being denied the right to receive information. It may receive the information, but it may not force the State to provide the information in a format which would quickly put the State out of business." Because access is not being denied, this Court is reluctant to find any first amendment violation. In light of this conclusion, it necessarily follows that, with respect to a first amendment claim, plaintiff has failed to establish a likelihood of success on the merits. Indeed, the Court further finds there are no serious questions going to the merits to make them a fair ground for litigation.

Absent a first amendment claim, plaintiff is unable to establish that any irreparable harm will flow from a failure to preliminarily enjoin defendants' actions. Because the Court concludes that the first amendment claim here is without merit, plaintiff cannot meet the threshold showing of irreparable injury required to obtain a preliminary injunction, and there is no need to discuss the likelihood of success with respect to plaintiff's remaining constitutional claims.[6]

---

**6.** Although not urged by plaintiff, to the extent irreparable harm may be seen to flow from a denial of the right to petition the legislature for redress of grievances, *see* Plaintiff's Memorandum of Law in Support of Application for Preliminary Injunction at 22–24, the claim may nonetheless be considered as without merit.

According to plaintiff, the citizenry is denied its right to petition the legislature because defendants have erected a barrier to the dissemination of information. A number of points are immediately apparent. First, plaintiff may not, in this context, raise the rights of third parties to challenge the constitutionality of the statute.

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied.

It is so Ordered.

Second, there is no question that Chapter 257 has increased the flow of information to the public by making it more accessible more quickly. Third, even though plaintiff is unable to subscribe to LRS, it, along with the citizenry in general, continues to have access to legislative materials through more traditional means.