766 F.2d 728
 54 USLW 2066, 11 Media L. Rep. 2482
 LEGI-TECH, INC., Plaintiff-Appellant,
v.
David W. KEIPER, Commissioner of the Legislative Bill
Drafting Commission of the State of New York, John J. Faso,
Commissioner of the Legislative Bill Drafting Commission of
the State of New York, Warren Anderson, Temporary President
of the Senate of the State of New York, Stanley Fink,
Speaker of the Assembly of the State of New York, and Mario
Cuomo, as Governor of the State of New York, Defendants-Appellees.
 No. 865, Docket 84-9021.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 20, 1985.
Decided July 5, 1985.
 
 Bruce D. Sokler, Washington, D.C. (Thomas J. Casey, Terrence J. Leahy, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., of counsel), for plaintiff-appellant.
 Harvey M. Berman, New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Robert Hermann, Sol. Gen., O. Peter Sherwood, Deputy Sol. Gen., New York City, of counsel), for defendants-appellees.
 Before VAN GRAAFEILAND, WINTER and PRATT, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This is an appeal from Judge Miner's denial of a preliminary injunction. The appellant, Legi-Tech, Inc., seeks to enjoin the defendants, officials of New York State, from denying it access to a state-owned computerized database that contains legislative information and is available through subscription to the general public. Legi-Tech's complaint, brought under 42 U.S.C. Sec. 1983 (1982), alleges an infringement of its rights under the First and Fourteenth Amendments. We conclude that the First Amendment may, under some circumstances, prohibit the state from denying Legi-Tech, an organ of the press, access to the database. However, the record on this appeal does not afford us sufficient information to resolve certain key factual issues. We therefore remand for further proceedings.
 
 BACKGROUND
 
 2
 Legi-Tech is a California corporation that markets a computerized information retrieval service known as the "Legi-Tech System." This service offers to subscribers computerized legislative information concerning the New York and California legislatures. The information provided includes summaries of pending legislation, votes on bills, attendance and voting records of individual legislators, and campaign contributions to individual legislators. Legi-Tech's customers include lobbyists, news media, corporations, and governmental agencies.
 
 
 3
 Since 1984, the Legislative Bill Drafting Commission of the State of New York (the "Commission") has offered to the public a "Legislative Retrieval Service" known as LRS. Like the Legi-Tech System, LRS is a computerized database. LRS contains the full text of legislation pending in the New York Legislature, as well as summaries thereof and certain other information. It appears that the primary difference between the two services is that LRS offers the full text of New York bills, while Legi-Tech offers only summaries. Unlike Legi-Tech, LRS does not offer information about the voting and attendance records of, and campaign contributions to, individual legislators. LRS is limited to New York legislation, while Legi-Tech covers California as well.
 
 
 4
 Legi-Tech unsuccessfully attempted to subscribe to LRS when the latter was in its pilot stage, and again after it became available to the general public. On June 1, 1984, Legi-Tech brought a state court action for an injunction requiring the Commission to offer LRS to Legi-Tech on the same terms as offered to other customers. In response, New York enacted Chapter 257 of the New York Laws, the provision which is in issue in the instant case. It has not yet been officially codified.
 
 
 5
 Chapter 257 establishes a "Legislative Computer Services Fund" consisting of revenues derived from the sale of LRS or other data processing services or publications. It also provides that:
 
 
 6
 Notwithstanding any provision of law to the contrary, the legislature is hereby authorized to engage in the sale of any of the foregoing services, programs or materials to such entities as the temporary president of the senate and speaker of the assembly, in their joint discretion, deem appropriate, except those entities which offer for sale the services of an electronic information retrieval system which contains data relating to the proceedings of the legislature.
 
 
 7
 Legi-Tech is clearly within the prohibitory portion of the statute, and the Commission dutifully denied Legi-Tech a subscription to LRS. Legi-Tech then filed the complaint in the instant case. It charges, inter alia, that Chapter 257 is unconstitutional on its face and as applied, in that it denies Legi-Tech and others freedom of speech and of the press, the only claims pressed on this appeal. The complaint seeks a declaration that Chapter 257 is unconstitutional, preliminary and permanent injunctions, and damages.
 
 
 8
 The district court rejected Legi-Tech's claim on the grounds that Chapter 257 does not deprive Legi-Tech of access to legislative information or restrict its ability to publish such information. It perceived the issue as analogous to claims of right to televise or tape courtroom trials, which have been recently rejected by this court. Legi-Tech, Inc. v. Keiper, 601 F.Supp. 371, 375 (N.D.N.Y.1984), citing Westmoreland v. Columbia Broadcasting System, Inc., 752 F.2d 16 (2d Cir.1984); United States v. Yonkers Board of Education, 747 F.2d 111 (2d Cir.1984). It viewed Legi-Tech as merely claiming a right to greater convenience in gathering legislative materials otherwise available, 601 F.Supp. at 375, and in effect as attempting to free ride on New York's financial support for the services provided by LRS. The district court concluded that Chapter 257 "is reasonable since it only seeks to protect the state's natural monopoly on computer supplied legislative information. Indeed, were the state not able to restrict access to LRS, competitors could easily retransmit the state's data at lower prices and thereby eliminate LRS entirely." Id. at 381.
 
 
 9
 We do not agree with the district court's legal theories for the reasons stated infra. However, because our own view of the law requires the development of certain factual matters, we remand for further findings.
 
 DISCUSSION
 
 10
 This case arises out of advances in a developing technology and is governed neither by direct precedent nor by close analogue. It is important at the outset, therefore, to define with some care the relationship of the relief Legi-Tech seeks to the First Amendment's protection of freedom of speech and of the press.
 
 
 11
 The district court was, we believe, only partially correct in regarding Chapter 257 as limited to the regulation of access to information in a particular format. Because the sole reason for denying Legi-Tech access to LRS is Legi-Tech's ability and desire to republish it, the right of publication is also implicated. The effect on publication, moreover, may be more than trivial. For example, Chapter 257 may prevent Legi-Tech from publishing in a timely fashion the full text of pending bills in New York in a package with relevant political information such as voting records and campaign contributions.
 
 
 12
 We further note that information about legislative proceedings, and in particular, pending legislation, is absolutely vital to the functioning of government and to the exercise of political speech, which is at the core of the First Amendment. See Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam); Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971); Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966).
 
 
 13
 Finally, we note that we are dealing in an area of rapidly developing technology and with novel and expanding forms of the exercise of the freedom of the press guaranteed by the First Amendment. Legi-Tech is currently the only entity that has been denied a subscription to LRS, but there is no reason to believe that this will long remain true. Legi-Tech and LRS use technology that is particularly well-suited to transmitting large amounts of rapidly-changing information. The ultimate sweep of Chapter 257 thus depends upon the development of that technology and of the commercial uses to which it may be put.
 
 
 14
 It is even now technologically possible to offer an "electronic newspaper" to subscribers who own personal computers. Such a service might transmit news items just as other services transmit stock market quotations or other information. If such a service included legislative information among its news items, it would fall within Chapter 257. On a more familiar level, a claim that the major wire services constitute "electronic information retrieval system[s]" that sometimes provide "data relating to ... the legislature" seems a colorable reading of the statute. It also seems obvious that Mead Data Corporation's "LEXIS/NEXIS" service and West Publishing Corporation's "WESTLAW" service, both familiar to most lawyers, do meet the statutory definition.
 
 
 15
 We take note of these matters, not because we intend to explore the application of Chapter 257 to such entities, but in recognition of the constitutional sensitivity of the issues raised by Legi-Tech's two-pronged challenge to Chapter 257. It claims that Chapter 257: (1) unconstitutionally discriminates between a state-owned member of the press, LRS, and other press organs by granting the former preferential access to pending legislation; and (2) unconstitutionally denies Legi-Tech equal access to LRS. We discuss these claims seriatim.
 
 
 16
 1. The Claim of Discriminatory Access to the Texts of Newly Introduced Legislation
 
 
 17
 Legi-Tech claims that Chapter 257 is unconstitutional because it, Legi-Tech, does not have the same access to the texts of newly introduced legislation as does LRS, and that this differential access, in conjunction with the prohibition against Legi-Tech's subscribing to LRS, is unconstitutionally discriminatory.
 
 
 18
 Because the procedural posture of this case limits us to a record containing only conflicting affidavits, we are unable to determine with precision the respective times at which and methods by which Legi-Tech and LRS receive printed copies of proposed legislation after it has been introduced. It appears to be undisputed that LRS automatically receives copies of newly introduced legislation as well as other legislative information through a process which is not available to Legi-Tech. Legi-Tech flatly asserts that LRS frequently publishes legislative information before it is publicly available in other printed form, and that the gap between LRS transmission and other public access is often days. This can be of considerable importance, particularly given the usual legislative rush at the end of a session. Legi-Tech further claims that on some occasions legislation is enacted before printed copies are available to the public but after transmission by LRS. The state disputes these assertions[1] and also argues that such differential access, even if it exists, is irrelevant.
 
 
 19
 We believe, however, this factual issue is of central importance. We perceive no merit in the proposition that government may accord a state organ of communication preferential access to information and deny to the private press the right to retransmit the information. We cannot agree with the district court that Chapter 257 "is reasonable since it only seeks to protect the state's natural monopoly on computer supplied legislative information." 601 F.Supp. at 381. There is nothing natural about the alleged monopoly in the instant case. The monopoly, if it exists, arises out of the combination of LRS' special access to information and Chapter 257's prohibition on competitors from having access to LRS' database.
 
 
 20
 The evils inherent in allowing government to create a monopoly over the dissemination of public information in any form seem too obvious to require extended discussion. Government may add its own voice to the debate over public issues, Community-Service Broadcasting v. FCC, 593 F.2d 1102, 1110 n. 17 (D.C.Cir.1978) (en banc), but it may not attempt to control or reduce competition from other speakers. Id.; cf. Buckley v. Valeo, 424 U.S. 1, 48-49, 96 S.Ct. 612, 648-649, 46 L.Ed.2d 659 (1976) (per curiam) (government may not restrict speech of some persons in order to enhance the relative voice of others). When the state creates an organ of the press, as here, it may not grant the state press special access to governmental proceedings or information and then deny to the private press the right to republish such information. Such actions are an exercise of censorship that allows the government to control the form and content of the information reaching the public. As previously noted, even the limited monopoly alleged here, if shown to exist, prevents the early publication of the complete text of proposed legislation from appearing in a package with information about voting records and campaign contributions.
 
 
 21
 The issue to be determined on remand with regard to this claim, therefore, is whether Legi-Tech can obtain printed copies of pending bills or other legislative information on substantially the same terms as LRS. Because the validity of a state statute is involved, we are loath to resolve this factual issue on the basis of the affidavits before us, particularly since the district court made no clear findings with regard to it.2. The Claim of Equal Access to LRS
 
 
 22
 Legi-Tech also argues that, even if it were afforded the same access to newly introduced legislation as LRS, Chapter 257 is unconstitutional in that it denies to Legi-Tech, an organ of the press, the same access to LRS as is offered to the general public. The district court concluded that Legi-Tech was not denied a substantial right by Chapter 257 because it merely left Legi-Tech "to gather the information it seeks in a manner which it finds to be less convenient." 601 F.Supp. at 375. The court thus concluded that Legi-Tech's claims were not analogous to In re Application of The Herald Co., 734 F.2d 93 (2d Cir.1984), which recognized a general right of access to pretrial courtroom proceedings, but more closely resembled cases such as Westmoreland and Yonkers. In Westmoreland a television network claimed a First Amendment right to televise judicial proceedings in certain circumstances. 752 F.2d at 21-24. Similarly, in Yonkers, a newspaper reporter asserted a First Amendment right to tape judicial proceedings. 747 F.2d at 112. Each of these cases thus involved a claim of right to a particular kind of access in addition to the general access afforded the public. In each case, we denied the claim.
 
 
 23
 We do not agree that the present case is closely analogous to either Westmoreland or Yonkers. Had the New York legislature not offered an LRS-type service at all, and had Legi-Tech claimed that offering such a service was constitutionally required, those cases might control. We face a different issue, however, for Chapter 257 denies to Legi-Tech the very access to information offered to the general public. Rather than seeking special access in addition to that enjoyed by the public, Legi-Tech seeks access equal to that offered the public.
 
 
 24
 Not surprisingly, there is support in the case law for the claim that the press has the same right of access to governmental proceedings as the general public. Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965) (criminal trial). The present case differs from Estes, and the subsequent decision in Richmond Newspapers v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion) (press and public have right to attend criminal trials), because in those cases public access was a right whereas here no right exists to compel provision of a service such as LRS. New York thus argues that the lack of a constitutional right to a service such as LRS precludes any First Amendment claim from arising out of the legislature's operation of LRS. In effect it argues that because it can constitutionally refuse to provide LRS at all, it may discriminate in offering LRS so long as that discrimination does not violate the equal protection clause of the Fourteenth Amendment.
 
 
 25
 We do not agree that the discriminatory denial of access to an organ of the press can never affect First Amendment rights where access generally is not constitutionally mandated. The Supreme Court has squarely held that the government may not single out the press to bear special burdens, even if evenhanded imposition of the identical burdens would be constitutionally permissible. In Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), the Court held that taxing the press differently from other businesses violated the First Amendment. The dissent argued that, because taxation does not in itself infringe First Amendment rights, differential taxation is subject to scrutiny only under the equal protection clause. Id. at 598-600, 103 S.Ct. at 1379-1380 (Rehnquist, J., dissenting). However, the majority explicitly rejected this argument, which is identical to that pressed by New York in the instant case, and held that "singling out the press for taxation" violated the First Amendment. Id. at 585-86 n. 7, 103 S.Ct. at 1371-72 n. 7.
 
 
 26
 We do not think that the rationale of Minneapolis Star is limited to taxation. Should New York decide to deny access to LRS to newspapers and the broadcast media as well as Legi-Tech, that decision would surely face a most hostile scrutiny under the First Amendment.[2] We say that because we believe it fairly obvious that the only purpose of such regulation would be to limit the dissemination of speech protected by the First Amendment, albeit only indirectly by limiting republication.
 
 
 27
 Of course, that is not the issue before us, because New York claims that it is regulating access to LRS for reasons other than the suppression of speech, namely to prevent free riding on LRS' costly efforts. When government regulates speech in the name of an interest unrelated to the suppression of speech, the regulation will survive constitutional challenge "only if the governmental interest outweighs the burden and cannot be achieved by means that do not infringe First Amendment rights as significantly." Minneapolis Star, 460 U.S. at 586 n. 7, 103 S.Ct. at 1372 n. 7; see United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968). The Court in Minneapolis Star further noted that "differential treatment [of the press], unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression." 460 U.S. at 585, 103 S.Ct. at 1371.
 
 
 28
 The district court identified as a "special characteristic" of Legi-Tech its role as a competitor of LRS. The court's argument, when unpacked, is that affording equal access to Legi-Tech would allow it to free ride on LRS' expenditures in rendering pending legislation suitable for electronic transmission. The effect of such free riding, it opined, would be to cause LRS to cease operation because the vast bulk of its subscribers would turn to Legi-Tech, which could offer all the services available from LRS as well as its other data at comparable or lower prices. LRS' demise would then diminish the information available to the public. See 601 F.Supp. at 381.
 
 
 29
 Our disagreement with the district court is not so much over its reasoning as over the application of that reasoning to Chapter 257. Viewed in its essentials, the argument is identical to that which justifies the existence of copyright laws in the face of the First Amendment, i.e. without protection from free riders, the incentive to compile and disseminate information would be destroyed. Harper & Row, Publishers, Inc. v. Nation Enterprises, --- U.S. ----, ----, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985). The unspoken premise of the copyright laws, however, is that the profit motive which is the incentive for creation is also a disincentive for suppression of the work created, a premise of doubtful strength in the case of government.
 
 
 30
 The profit motive's weakness where government is concerned is starkly evident in Chapter 257's own provisions, which prohibit potential retransmitters from subscribing to LRS rather than offering subscriptions to them at prices that eliminate the potential for free riding. To revert to the copyright analogy, LRS is refusing to license reproduction at any price even though reproduction would increase purchases of the product without reducing LRS' incentive to produce more information.
 
 
 31
 It is our view that, absent an attempt to modify Chapter 257 so that it conforms to its ostensible purpose of preventing free riding, the prohibition affecting Legi-Tech cannot be regarded as "unrelated to the suppression of speech." We cannot at this distance claim to discern ulterior motives underlying Chapter 257. Nevertheless, one effect of its prohibition on retransmittal is that the full text of legislation pending in the New York Legislature is not available at the present time in a computerized format that also catalogs campaign contributions to legislators, as well as their attendance and voting records. Similar effects diminishing the information available to the public will surely occur with the further development of the computerized format for news purposes.
 
 
 32
 We are assured by Legi-Tech that it makes no claim that LRS must allow those able and intending to retransmit LRS material to subscribe at the same price as those who have no such plans or ability. To the extent that concession means that Legi-Tech is willing to pay the true cost to LRS of its subscription, namely the revenue LRS will lose as a consequence of Legi-Tech's retransmission of LRS materials, we believe that LRS may not decline to offer subscription rights to Legi-Tech.
 
 
 33
 Counsel for the state has argued that establishing the price for retransmission rights is so complex as to be impossible. We agree that exact precision may not be achievable but believe that an adequate approximation, perhaps rough in the beginning but more exact over time, is within reach. LRS knows its own costs and has set a price for its present subscribers without difficulty. We cannot ignore, moreover, the ubiquitous role of government in regulating and setting rates in far more complex situations than this. We assume that Legi-Tech understands that our ruling anticipates its cooperation with New York authorities in providing whatever information about its operations is necessary to setting a reasonable price.
 
 
 34
 We thus recognize a limited right of access on Legi-Tech's part to LRS materials. We believe, however, that Legi-Tech has not, at this initial stage, proved an essential element of its claim. Although the parties made much at oral argument of the costs of converting printed material to a computerized format, the record, which consists largely of affidavits, provides little basis for us to make a judgment as to whether the costs of conversion of the materials offered by LRS are either necessary or significant. If these costs are either avoidable or de minimis, Legi-Tech's claim would fail for lack of any showing of harm. We cannot, therefore, reverse on this ground, although we trust that on remand a record will be developed to support appropriate findings.
 
 CONCLUSION
 
 35
 Chapter 257 can be upheld, therefore, only if the district court on remand finds that Legi-Tech has access to the texts of proposed legislation on substantially the same terms as LRS and that the costs of converting those texts to a computerized format are neither avoidable nor de minimis. Both findings are necessary to Chapter 257's validity, because the elimination of a differential access to the texts of bills will not cure the discrimination in the offering of LRS to the general public but not to Legi-Tech.
 
 
 36
 Understandably, Legi-Tech has reminded us that urgency attends colorable claims that First Amendment rights are being infringed. We are mindful of that proposition but, given the importance of the unresolved factual issues outlined in this opinion and the sparseness of the present record, we must remand to the district court for proceedings consistent with this opinion.
 
 
 
 [1]
 We are troubled by the state's assertion that even though LRS automatically receives newly introduced bills, Legi-Tech has comparable access because it may be able to obtain upon request a copy from bills' sponsors. We do not share the assumption that the anticipated helpfulness of individual sponsors is the equivalent of a process that automatically distributes newly proposed legislation
 
 
 [2]
 In Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), the Court held that the Federal Bureau of Prisons could ban reporters from conducting interviews with specific inmates because the general public was not allowed access to specific inmates other than relatives, close friends, etc. The Court's approach strongly suggests that if the Bureau of Prisons decided to afford the general public broader access to inmates, it would have to permit the press the same degree of access even though the broader access was not constitutionally mandated