[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Adult Choices, Inc., filed a three-count complaint on May 18, 1992, seeking to recover damages for the alleged breach of an advertising contract by the defendants, Post Publishing Company ("Post"), and Dudley Thomas, the publisher of the Bridgeport Post now known as the Connecticut Post.
The following allegations are taken from the plaintiff's complaint. The plaintiff is in the business of renting and selling erotic adult video tapes. In May and August of 1991, the plaintiff entered into written advertising agreements with the Post whereby the plaintiff could, at its option, place advertisements in the Bridgeport Post. Under the terms of the agreement, if the plaintiff placed enough advertisements to exceed a specified number of "column inches," the plaintiff would qualify for a special low rate (per column inch).
The Post accepted and printed the plaintiff's advertisements until February 9, 1992, when defendant Thomas, after receiving a complaint letter, refused to publish the plaintiff's advertisements in future issues of the Bridgeport Post. The plaintiff alleges that the defendants' refusal to publish its advertisements caused the plaintiff to incur an ascertainable loss of business and profits. The plaintiff further alleges that after the defendants refused to accept the plaintiff's advertisements, the defendants continued to publish advertisements placed by "exotic dancing" establishments, men's "health spas," and massage parlors.
In the first count of its complaint, plaintiff asserts a breach of contract claim against defendant Post. In the second CT Page 5091 count, the plaintiff alleges that defendant Post's conduct violated the Connecticut Unfair Practices Act, General Statutes42-110a et seq. ("CUTPA"). The third count asserts a CUTPA claim against defendant Thomas. The defendants filed an answer on July 1, 1992, along with two affirmative defenses: (1) that the First Amendment to the United States Constitution prohibits the use of state law to force publication by a newspaper; and (2) that Thomas, an employee of the Post who was acting within the scope of his employment, is also entitled to protection pursuant to the First Amendment.
On January 21, 1993, the defendants filed a motion for summary judgment (#109) along with a memorandum of law, supporting affidavits, deposition testimony and other documentary evidence. On February 11, 1993, the plaintiff filed a memorandum of law in opposition (#113) along with deposition testimony and documentary evidence.
Practice Book 384 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Lees v. Middlesex Insurance Co. 219 Conn. 644,650, 594 A.2d 952 (1991). A material fact is one that will make a difference in the case. Yanow v. Teal Industries, Inc.,178 Conn. 262, 268,-69, 422 A.2d 311 (1979). The court's function, in ruling on a motion for summary judgment, is to determine whether an issue of material fact exists, not to resolve such issues. Telesco v. Telesco, 187 Conn. 715, 718, 447, A.2d 752 (1982). The motion should be denied unless the evidence is such that no room for disbelief could exist in the minds of the jurors. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471
(1982). Because the burden of proof is on the moving party, the facts presented must be viewed in the light most favorable to the party opposing the motion. Mingachos v. CBS, Inc.,196 Conn. 91, 111, 491 A.2d 368 (1985).
A. Breach of Contract: First Count
In support of their motion for summary judgment on the first count, the defendants argue that the written advertising "agreement" signed by the parties is not an enforceable contract because it lacks mutuality of obligation. The defendants argue in the alternative that if a contract exists, it is a unilateral contract which is accepted by the plaintiff's performance and CT Page 5092 which the defendants reserved the right to cancel. The defendants further contend that they properly cancelled the contract, and therefore, should be entitled to judgment as a matter of law on the first count.
In response, the plaintiff contends that the parties' "agreement" is a valid, enforceable contract which was improperly terminated by the defendants. The plaintiff also argues that the rejection language contained in the agreement did not give the defendants the right to refuse to accept the plaintiff's advertisements.
[A]n essential prerequisite to the formation of a contract is an agreement: a mutual manifestation of assent to the same terms." Calamari Perillo, Contracts, 2-1. Mutual assent is usually established by a process of offer and acceptance. Id.
There is no dispute that the defendants' sales representative solicited business from the plaintiff, and in so doing, had the plaintiff sign a written advertising agreement. Paragraph 13 of the defendant's "rate card" (which is part of the agreement) provides that "the forwarding of an order will be construed as an acceptance of the rates and conditions under which advertising space . . . is sold by the Bridgeport Post." (Emphasis added.)
The defendants are the offerors, as the defendants offered to print advertisements submitted by the plaintiff, as long as those advertisements were acceptable to the defendants. Based on language contained in the advertising agreement (i.e. "[a]ll advertising rates are net cash . . . except where credit has been approved. . . ."), the defendants seek from their advertisers (the "offerees") a return promise to pay for any advertisements which are published by the defendants. Thus, the plaintiff impliedly promised to pay the defendants for any advertisements that the defendants published.
These mutual promises, which confer benefits and corresponding detriments on the parties, are sufficient consideration to support a bilateral contract. See Calamari Perillo, Contracts 4-1; State National Bank v. Dick, 164 Conn. 523,529, 325 A.2d 235 (1973).
The defendants also argue that the advertising agreement is not a valid contract because the plaintiff is not obligated to CT Page 5093 place any advertisements with the defendants. (See affidavit submitted by defendants' advertising director at paragraphs 9 and 10.) "A requirements contract is one under which the seller agrees to sell and the buyer to buy all of the goods of a particular kind that the buyer may require in his business." (Emphasis in original.) Farnsworth, Contracts, 2.15. "The buyer's requirements are usually fixed in terms of a period of time but may also be fixed in terms of a particular enterprise." Id., n. 1, citing R. A. Weaver Assoc v. Asphalt Constr.,587 F.2d 1315 (D.C. Cir. 1978). A requirements contract is not necessarily illusory because the buyer must act in good faith in determining its requirements. (See Farnsworth, Contract, 2.15. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Warner v. Konover, 210 Conn. 150, 154, 553 A.2d 1138 (1989), quoting the Restatement (second) of Contracts, 205.
In the present case, the parties' advertising agreements were in effect for a term of one year. (See parties' advertising agreements, attached as exhibits to defendants' motion.) Pursuant to the advertising agreements, the defendants expected to receive a minimum amount of advertising annually from an advertiser (see affidavit of Christine Marshall at para. 4) and the plaintiff, as an advertiser, had a good faith duty to perform under the contract.
The defendants also argue that the parties' advertising agreements cannot constitute valid contracts because the plaintiff is free to cancel at any time. Generally, if a party can terminate a contract at any time at will, without more, — the promise will be held to be illusory. Farnsworth, Contract, 2.14. However, if a party is required to give notice at some stated period of time before the termination takes effect, the promise will not be held to be illusory. Id. In the present case, the parties' advertising agreements require the plaintiff/advertiser to provide the defendant/publisher with thirty days written notice of termination within thirty days after receipt of the notice of rate changes." (See parties' advertising agreements, attached as exhibits to the defendants' motion.)
The defendants also argue that because they reserved the right not to perform, the parties' advertising agreements cannot constitute enforceable contracts. The advertising agreements state in pertinent part that the publisher "reserves the right CT Page 5094 to cancel advertising at any time upon failure of the Advertiser to meet any of terms or conditions set forth in this Agreement, or in the Publishers Rate Cards . . . ." (See parties' advertising agreements and rate cards attached as exhibits to the defendants motion.) Both the rate cards and the advertising agreements provide as follows:
 The publisher reserves the right to edit, revise, reclassify or reject any advertising. . . .
(Rate card "terms and conditions," para. 1; advertising agreement "copy regulations," para. 4), and
 The Bridgeport Post will not knowingly publish any advertisement which is illegal, misleading or offensive to its readers. . . .
(Rate card "para. 2; advertising agreement, para. 6).
The advertising agreements and rate cards provide the defendants with the right to reject advertisements (i.e., the right "not to perform") in certain situations. The defendants must act in good faith in rejecting advertisements and in refusing to perform pursuant to the advertising agreements. See Warner v. Konover, supra, 154.
The affidavit of the defendants' advertising director states at paragraph 11 that "[o]n or about February 9, 1992, the Post notified Adult Choices, Inc. that the Post would no longer accept ads for erotic adult videos." In his deposition testimony, defendant Thomas states that he received complaints from readers (page 6) and decided not to accept ads from adult video stores (page 7) because he finds such ads to be offensive ( Page 10.) for reasons that he "can't explain" (page 11). Thomas also states that after the plaintiff redesigned its advertisement and removed an "offensive illustration," he characterized the new advertisement as "not really offensive" and continued to adhere to his policy of not accepting ads from adult video businesses (page 15). The plaintiff's deposition testimony details his efforts to redesign his advertisement, as well as his participation in the redesigning process along with various agents and employees of the Post (pp. 38-49). The plaintiff's testimony also details the defendants' policy of publishing advertisements submitted by other types of adult CT Page 5095 entertainment establishments (other than adult video stores). (page 50).
The court finds that the parties' advertising agreements constitute valid contracts. Based on the parties' affidavits and deposition testimony, a genuine issue of material fact exists as to whether the defendants acted in good faith in refusing to perform pursuant to the parties' contracts, and in cancelling these contracts.
Therefore defendants' motion for summary judgment on the first count is denied.
B. CUTPA: Second and Third Counts
In support of their motion for summary judgment on the plaintiff's second and third counts, the defendants argue that the First Amendment to the United States Constitution and its guarantee of freedom of the press provides the defendants with a constitutional right to choose whether or not to publish advertisements. The defendants further contend that protecting the freedom of the press outweighs the policy of protecting businesses from injury due to an allegedly unfair or deceptive business practice or an alleged breach of contract.
In response, the plaintiff argues that a newspaper publisher can "contract away" its first amendment right to refuse to publish a certain advertisement. The plaintiff also argues that the defendants "lured" it into an advertising agreement, and the plaintiff expended money in preparing and instituting its advertising campaign, and that the defendants' refusal to publish the plaintiff's advertisements constitutes an actionable violation of public policy.
General Statutes 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes 42-110g(c) provides in pertinent part that "[a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by 42-110b, may bring an action . . . to recover actual damages."
 In determining whether a practice violates CUTPA, we use the following criteria: "(1) CT Page 5096 [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers[,] competitors or other businessmen."
(Citations omitted.) Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 254, 550 A.2d 1061 (1988).
In Cyntje v. Daily News Publishing Co., 551 F. Sup. 403
(D.C. V. I. 1982), the defendant newspaper refused to publish the plaintiff's ads because they were not in accordance with the newspaper's standards. Id., 405. The court, in granting summary judgment in favor of the newspaper, held that
 [s]o long as such a refusal is not the result of racial discrimination or based on an otherwise invidiously discriminatory classification . . ., a publication cannot, under the guarantees of a free press . . . be compelled to print or disseminate a paid advertisement.
(Citation omitted.) Id., See also America's Best Cinema Corporation v. Fort Wayne Newspapers, Inc., 347 F. Sup. 328
(N.D. Ind., 1972) (newspaper's policy of refusing all ads from "Adult" movie theatres did not deprive theatre owners of any rights guaranteed by the Constitution.)
"The first amendment does not grant upon the people an absolute right to speak in the private forum of their choices." Rattner v. Netbur, 733 F. Sup. 162, 168 (S.D.N.Y 1989); In re G. A Books, Inc., 770 F.2d 288, 299 (2d Cir. 1985), cert. denied, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). "The choice of material to go into a newspaper . . . whether fair or unfair — constitute[s] the exercise of editorial control and judgment." Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241,258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). "The degree CT Page 5097 of discretion which editors utilize in rejecting advertisements is not distinguishable, under First Amendment analysis from that exercised over any other submitted matter." Sinn v. Daily Nebraskan, 638 F. Sup. 143, 146 (D. Neb 1986).
The following material facts are not in dispute: (1) that the defendants' sales agent contacted the plaintiff and entered into two written advertising "agreements" with the plaintiff; (2) that the plaintiff placed advertisements in the defendants' newspaper; and (3) that the defendants accepted and published the plaintiff's advertisements until February 9, 1992, when defendant Thomas refused to publish the plaintiff's advertisements. The plaintiff's contentions that it was "lured" into a contractual relationship with the defendants, and that it "relied" on the defendants' promises to its detriment do not raise genuine issues of material fact because these claims are not germane to the question of whether the defendants' refusal to publish the plaintiff's advertisements violates public policy.
The defendant's refusal to publish the plaintiff's advertisements is actually supported by public policy as it has been established by the First Amendment and the case law which interprets the scope of "freedom of the press." In light of a newspaper editor's broad discretion in deciding what material gets published, a newspaper editor's refusal to publish an advertisement cannot constitute a violation of public policy (nor can it constitute deceptive, unfair, immoral, oppressive or unethical behavior) unless such refusal to publish is based on an "invidiously discriminatory classification." See Cyntje v. Daily News Publishing Co., supra 405.
Since the defendants' exercise of editorial discretion did not violate any public policy as it has been established by "statutes, the common law, or otherwise," and since their exercise of editorial discretion does not constitute an "immoral, unethical, oppressive or unscrupulous" practice, the plaintiff's CUTPA claims must fail as a matter of law, and the defendants are entitled to summary judgment on the second and third counts of the plaintiff's complaint.
LEHENY, JUDGE CT Page 5098